Warren E. Gluck, Esq.
Matthew R. DiBlasi, Esq.
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, NY 10019
(212) 513-3200
warren.gluck@hklaw.com
matthew.diblasi@hklaw.com

*Attorneys for Plaintiff-Judgment-Creditor*
*FG Hemisphere Associates, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FG HEMISPHERE ASSOCIATES, LLC,

      Plaintiff-Judgment-Creditor,           19-mc-00232-JPO

    v.

DEMOCRATIC REPUBLIC OF CONGO, *et ano*,

      Defendants-Judgment-Debtors.

**MEMORANDUM OF LAW IN SUPPORT OF JUDGMENT
CREDITOR'S *EX PARTE* MOTION FOR WRITS OF EXECUTION,
ISSUANCE OF RESTRAINING NOTICES AND TURNOVER OF ASSETS**

# TABLE OF CONTENTS

**Page**

I.  THE JUDGMENTS ARE ENFORCEABLE AS IF ENTERED BY THIS COURT ........4

II.  A WRIT OF EXECUTION SHOULD ISSUE IMMEDIATELY .......................................4

III.  RESTRAINING DRC ASSETS IS PERMISSIBLE UNDER APPLICABLE LAW .........5

    A.  Assets Held In The Name Of The DRC Mission and the Co-Conspirators Are DRC Property And Subject To Restraining Notices.................................................5

    B.  Restraining Notices Are Available Under FRCP And New York Law To Execute On A Judgment ........................................................................................6

    C.  Restraining Notices Are Permitted Under the FSIA .................................................7

    D.  Expedited Discovery Is Appropriate To Demonstrate the Embezzlement Scheme, Identify Additional Non-Immune Assets and Restrain Additional Dissipation Of DRC Funds ....................................................................................17

    E.  Plaintiff Is Likely To Obtain Ultimate Relief ........................................................18

IV.  TURNOVER OF DRC ASSETS HELD BY A GARNISHEE IS WARRANTED AND PERMISSIBLE UNDER THE FSIA AND ARTICLE 52 OF THE CPLR ......................19

    A.  The Statutory Basis For Turnover Proceedings .....................................................20

    B.  Plaintiff Has Demonstrated Its Entitlement To A Turnover Order Under CPLR §§ 5225(b) and 5227 ..............................................................................................22

V.  *EX PARTE* PROCEEDINGS ON EXECUTION ARE APPROPRIATE........................24

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adler v. Fed. Republic of Nigeria*,
219 F.3d 869 (9th Cir. 2000) ...................................................10

*Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*,
190 F.3d 16 (2d Cir. 1999)......................................................20

*Ayyash v. Bank Al-Madina*,
No. 04 Civ. 9201 (GEL), 233 F.R.D. 325 (S.D.N.Y. Jul. 12, 2005) ......................17

*Balkan Energy Ltd. v. Republic of Ghana*,
302 F. Supp. 3d 144 (D.C. Cir. 2018) ...................................16

*Beauvais v. Allegiance Sec., Inc.*,
942 F.2d 838 (2d Cir. 1991)...............................................20, 22

*Birch Shipping Corp. v. Emb. United Rep. of Tanzania*,
507 F. Supp. 311 (D.C. Cir. Nov. 18, 1980)........................12, 13, 16

*Blue Angel Cap. I v. The Republic Of Argentina.*,
No. 1:07-cv-02693, 2008 WL 8449425 (S.D.N.Y. Oct. 30, 2008)........................5

*Brenntag Int'l Chems., Inc. v. Bank of India*,
175 F.3d 245 (2d Cir. 1999)................................................18

*Centerpointe Corporate Park Partnership 350 v. MONY*,
96 A.D.3d 1401 (4th Dep't 2012) .......................................21

*Cicippio v. Islamic Republic of Iran*,
30 F.3d 164 (D.C. Cir. 1994) ............................................10

*Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*,
423 F. Supp. 3d 45 (S.D.N.Y. 2019)....................................19

*Compagnie Noga D' Imp. et D'exp. SA v. Russian Fed'n*,
361 F.3d 676 (2d Cir. 2004)................................................5

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
No. 16 Civ. 661, 2017 WL 6349729 (D.C. Cir. June 9, 2017) ...............16

*CSX Transportation, Inc. v. Emjay Environmental Recycling, Ltd.*,
12-CV-1865 (JS) (AKT), 2016 WL 755630 (E.D.N.Y. Feb. 25, 2016)................21, 22

*CSX Transportation, Inc. v. Island Rail Terminal, Inc.*,
   879 F.3d 462 (2d Cir. 2018)............................................................................22

*De Csepel v. Rep. of Hungary*,
   714 F.3d 591 (D.C. Cir. 2013) ..........................................................................9

*De Letelier v. Republic of Chile*,
   748 F.2d 790 (2d Cir. 1984).............................................................................10

*Deary v. Guardian Loan Co.*,
   534 F. Supp. 1178 (S.D.N.Y. 1982)...................................................................24

*Endicott Johnson Corp. v. Encyclopedia Press*,
   266 U.S. 285 (1924)..........................................................................................24

*FG Hemisphere Assocs., LLC v. Dem. Repub. of Congo, and Societe Nationale
   D'Electricite (S.N.E.L.)*,
   Nos. 1:19-mc-00232-JPO, 1:19-mc-00189-DLC. (S.D.N.Y.) .................................4

*FG Hemisphere Assocs., LLC v. République du Congo*,
   455 F.3d 575 (5th Cir. 2006) ...........................................................................15

*FG Hemisphere v. Democratic Republic of Congo, and Societe Nationale
   D'Electricite*,
   Nos. 03-1314, 03-1315 ......................................................................................3

*Fid. Partners, Inc. v. Philippine Export and Foreign Loan Guar. Corp.*,
   921 F. Supp. 1113 (S.D.N.Y. 1996)................................................................5, 24

*First City, Texas-Houston, N.A. v. Rafidain Bank*,
   197 F.R.D. 250 (S.D.N.Y. 2000) .........................................................................7

*Gadsby & Hannah v. Romania*,
   698 F. Supp. 483 (S.D.N.Y. 1988) ...............................................................6, 17

*Hassett v. Goetzmann*, Misc. 2867, 1992 US Dist. LEXIS 13218, at *8 (N.D.N.Y.
   Sept. 1, 1992) ....................................................................................................4

*Itel Containers Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro*,
   No. 90 Civ. 8191 (CES), 1991 US Dist. LEXIS 827 (S.D.N.Y. January 25,
   1991) ................................................................................................................24

*Kensington Int'l Ltd. v. Societe Nationale des Petroles du Congo*,
   05 Civ. 5101 (LAP), 2006 US Dist. LEXIS 14264 (S.D.N.Y. Mar. 31, 2006)
   *abrogated on other grounds*, *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147 (2d
   Cir. 2007) ..........................................................................................................9

*Koehler v. Bank of Berm., Ltd.*,
   544 F.3d 78 (2d Cir. 2008)...........................................................................................17, 24

*McCahey v. L.P. Investors*,
   774 F.2d 543 (2d Cir. 1985)...........................................................................................6, 24

*Mitchell v. Lyons Professional Services, Inc.*,
   No. 09 Civ. 1587 (BMC), 2010 WL 3018322 (E.D.N.Y. Jul. 29, 2010)...............................22

*Ned Chartering & Trading, Inc. v. Republic of Pakistan*,
   130 F. Supp. 2d 64 (D.C. Cir. 2001)..............................................................................16, 17

*OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*,
   419 F. Supp. 3d 51 (D.C. Cir 2019).....................................................................................16

*Olympic Chartering S.A. v. Ministry of Indus. & Trade of Jordan*,
   134 F. Supp. 2d 528 (S.D.N.Y. 2001).................................................................................15

*Owens v. Republic of Sudan*,
   141 F. Supp. 3d 1 (D.C. Cir. 2015)......................................................................................16

*Pablo Star Ltd. v. Welsh Gov't*,
   378 F. Supp. 3d 300 (S.D.N.Y. 2019), *aff'd*, 961 F.3d 555 (2d Cir. 2020), *cert.
   denied*, 141 S. Ct. 1069, 208 L. Ed. 2d 531 (2021) ...............................................................9

*Petersen Energía Inversora S.A.U. v. Argentine Republic*,
   895 F.3d 194 (2d Cir. 2018)..................................................................................................9

*Peterson v. Republic of Iran*,
   No. 10 Civ. 4518 (KBF), 2013 WL 1155576 (S.D.N.Y. Mar. 13, 2013)...............................17

*Pharo Gaia Fund Ltd. v. Bolivarian Rep. of Venezuela*,
   No. 18 CIV. 11940, 2021 WL 2168916 (S.D.N.Y. May 27, 2021)........................................16

Plaintiff Has Demonstrated Its Entitlement To
   A Turnover Order Under CPLR §§ 5225(b) and 5227 ..........................................................22

*Rep. of Arg. v. Weltover, Inc.*,
   504 U.S. 607 (1992)............................................................................................................15

*Republic of Argentina v. Weltover, Inc.*,
   504 US 607 (1992)................................................................................................................9

*Rubin v. Islamic Republic of Iran*,
   637 F.3d 783 (7th Cir. 2011) ...............................................................................................15

*Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Rep.*,
   877 F.2d 574 (7th Cir. 1989) ...............................................................................................15

*Saregama India, Ltd. v. Mosley*,
    Nos. 12–mc–45–P1, 11–mc–84–P1 (LAK), 2012 WL 955520 (S.D.N.Y. Mar.
    20, 2012) .................................................................................................................21

*Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993) ..............................................................................................9, 10

*Servaas Inc. v. Republic of Iraq*,
    686 F. Supp. 2d 346 (S.D.N.Y. 2010) ........................................................................5

*Smith v. FRB*,
    346 F.3d 264 (2d Cir. 2003) .......................................................................................4

*Southway v. Central Bank of Nigeria*,
    198 F.3d 1210 (10th Cir. 1999) ................................................................................10

*Squeez-a-Purse Corp. v. Stiller*,
    31 F.R.D. 261 (S.D.N.Y. 1962) ..................................................................................4

*Tex. Trading & Milling Corp. v. Fed. Rep. of Nig.*,
    647 F.2d 300 (2d Cir. 1981) .....................................................................................15

*Trans Commodities, Inc. v. Kazakstan Trading House*,
    S.A., No. 96 Civ. 9782, 1997 WL 811474 (S.D.N.Y. May 29, 1997) ....................15

*Trans Commodities, Inc. v. Kazakstan Trading House, S.A.*,
    No. 96 Civ. 9782 (BSJ), 1997 US Dist. LEXIS 23906 (S.D.N.Y. 1997) .................7

*Trust v. Kummerfeld*,
    153 F. App'x 761 (2d Cir. 2005) ..............................................................................21

*United States v. Vulpis*,
    967 F.2d 734 (2d Cir. 1992) .......................................................................................6

*Walters v. Indus. & Commer. Bank of China, Ltd.*,
    651 F.3d 280 (2d Cir. 2011) .......................................................................................7

*Westchester Fire Insurance Company v. DeNovo Constructors, Inc.*,
    177 F. Supp. 3d 810 (S.D.N.Y. 2016) ......................................................................18

**Statutes and Rules**

28 U.S.C. §1603(a) .........................................................................................................5

28 U.S.C. § 1603(d) ...................................................................................................9, 14

28 U.S.C. §1610(a) .................................................................................................. *passim*

28 U.S.C. §1610(a)(6) .....................................................................................................8

28 U.S.C. § 1610(c) ..................................................................................... *passim*

28 U.S.C. § 1963 ...................................................................................................4

28 USC § 1610(a)(1) ........................................................................................8, 14

C.P.L.R. § 5201 ...................................................................................................17

C.P.L.R. § 5222 ........................................................................................... *passim*

C.P.L.R. § 5225 .............................................................................................17, 21

C.P.L.R. § 5225(a) ..............................................................................................17

C.P.L.R. § 5225(b) ...................................................................................... *passim*

C.P.L.R. § 5227 .......................................................................................... *passim*

C.P.L.R. § 5232 ...................................................................................................17

Fed. R. Civ. P. § 64 ................................................................................... *passim*

Fed. R. Civ. P. § 69 ................................................................................... *passim*

**Other Authorities**

HR R. No, 94-1487, at 15 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6613 ...........................5

N.Y. Prac., *Com. Litig. In New York State Courts* § 58:24 (4th ed. 2015) ...................................21

Plaintiff, FG Hemisphere Associates ("FG" or "Plaintiff"), a judgment creditor of the Democratic Republic of Congo ("DRC"), respectfully submits this memorandum of law in support of its *ex parte* application for an order (i) authorizing Plaintiff to deliver writs of execution to the United States Marshals Service pursuant to Article 52 of New York's Civil Practice Law and Rules ("CPLR") permitting execution on DRC's and its agents' property in the United States; (ii) authorizing Plaintiff to issue restraining notices on TD Bank and the United Nations Federal Credit Union ("UNFCU") accounts of the DRC and its sub-division, the Permanent Mission of the Democratic Republic of Congo ("DRC Mission"), Ignace Gata Mavita wa Lufuta ("Gata"), Paul Losoko Efambe Empole ("Empole"), Victoria Lieta Liolocha ("Liolocha"), Hippolyte Kingonzila Mfulu ("Mfulu"), Bianza Therese Yvette Mpinga ("Mpinga") or Marie Huguette Nkus Ngung ("Ngung") (such individuals being collectively the "Co-Conspirators"); (iii) directing TD Bank and the UNFCU, as garnishees, pursuant to FRCP 64 and 69(a) and CPLR §§ 5225(b) and 5227, to turn over all assets of the DRC and its sub-division, the DRC Mission, held in accounts in the name of the DRC Mission or in the names of any of the Co-Conspirators; (iv) permitting Plaintiff to maintain priority over other creditors who may also seek to attach or execute upon the same assets; and (v) requiring the DRC and its agents to respond to expedited discovery so that Plaintiff can identify any additional property in the United States that is or will become available to satisfy Plaintiff's $30+ million in final judgments.[1]

## PRELIMINARY STATEMENT

Plaintiff holds two final, enforceable and unsatisfied U.S. judgments against the DRC and Société Nationale D'Électricité (collectively, the "Judgment Debtors"), the principal amount of which exceeds $30 million, plus accruing interest. The DRC has engaged in a prolonged campaign to unlawfully obstruct Plaintiff's enforcement efforts. As a result, Plaintiff has been forced to

---

[1] The CPLR applies in judgment enforcement proceedings under Federal Rule of Civil Procedure 69(a), which provides that "the procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located . . ."

undertake a years-long investigative effort to trace and locate DRC assets and property so that Plaintiff can seek to restrain and ultimately execute on such assets and property to satisfy the judgments.

As set forth in the Declaration of Peter Grossman, dated August 10, 2021 ("Grossman Decl."), Plaintiff's investigation has revealed a sprawling enterprise through which millions of dollars in DRC assets were embezzled by senior DRC government officials and their co-conspirators (the "DRC Embezzlement Enterprise"). The DRC Embezzlement Enterprise includes various schemes orchestrated and authorized by the then DRC president Joseph Kabila ("Kabila"), meaning that the DRC Embezzlement Enterprise was sanctioned and approved at the highest level of the DRC government. Part of the DRC Embezzlement Enterprise involved transfers of money and other assets in the U.S. effectuated through the DRC Mission. *See* Grossman Decl. ¶¶ 3-9. Financial records produced to Plaintiff revealed that the DRC has property within and adjacent to the state of New York, including cash reserves in the possession of third-party garnishee banks (UNFCU and TD Bank), real property and financial investments. *Id.* ¶¶ 20-53. Plaintiff's investigation revealed that Gata, the DRC's permanent representative to the United Nations (the "UN") for many years, has, in furtherance of the DRC Embezzlement Enterprise, used the DRC Mission Accounts to hold, and then embezzle, millions of dollars derived from monies owed by the UN to the DRC, all for the benefit of the Co-Conspirators, members of Kabila's family and his close associates. *Id.* ¶¶ 10-19. The DRC Mission Accounts (as defined in the Grossman Decl.)[2] were used to consummate numerous improper transactions (involving at least $12,156,399 million and possibly an additional $13,736,763.77), all under the guise of state or diplomatic purposes, but which instead diverted such funds to the private benefit of Kabila's family and his close associates, as well as to the Co-Conspirators. *Id.* ¶¶ 19, 25-28.

In essence, the DRC Mission's purported diplomatic purpose is simply a chimera that veils the improper actions of a kleptocracy acting with impunity in New York, and the DRC Mission

---

[2] All capitalized terms not defined herein are defined in the Grossman Decl.

account is subject to enforcement.  Moreover, and perhaps most importantly, the funds in the accounts of the Co-Conspirators are subject to enforcement by FG as a judgment creditor of the DRC.

By this application, Plaintiff seeks to immediately preserve the status quo through the issuance of writs of execution, restraining notices and a turnover order for monies in the Co-Conspirators' and/or the DRC Mission's name at TD Bank and the UNFCU pursuant to the Foreign Sovereign Immunities Act ("FSIA") § 1610, FRCP 64 and 69, and Article 52 of the CPLR. Although the DRC is a sovereign entity, the requested relief is permissible because the DRC Mission Account, and the DRC property (*i.e.*, monies that have been diverted into the Co-Conspirators' personal accounts) have been used for "commercial activity" in the United States, as such term is defined under the FSIA, and more than "a reasonable period of time" has elapsed since entry of the unsatisfied judgments. Expedited discovery is also necessary to identify additional DRC assets that may be executed upon prior to further dissipation and to further determine the nature and facts surrounding the Embezzlement Enterprise.

## STATEMENT OF FACTS

A complete statement of the facts supporting this application is set forth in the accompanying Grossman Decl. and the Declaration of Warren E. Gluck, dated August 10, 2021 ("Gluck Decl."), both of which are filed contemporaneously herewith.  The key facts are that Plaintiff obtained certain arbitral awards against the DRC which were affirmed, and final judgments were entered by the United States District Court for the District of Columbia on September 19, 2004 ("2004 Judgment") in the amount of $11,725,844.96, together with accruing interest; and on January 31, 2005 ("2005 Judgment") in the amount of $18,430,555.47 plus accruing interest (collectively, the "Judgments").  *See* Gluck Decl., ¶¶ 2-3.

On December 21, 2015, in the action captioned *FG Hemisphere v. Democratic Republic of Congo, and Societe Nationale D'Electricite*, Nos. 03-1314, 03-1315, the United States District Court for the District of Columbia issued an order reviving the Judgments.  *Id.*  As a result, the

Judgments are fully enforceable against the Judgment Debtors.  On April 11 and May 2, 2019, under 28 U.S.C. § 1963, Plaintiff registered the 2004 and 2005 Judgment with the United States District Court for the Southern District of New York in the action captioned *FG Hemisphere Assocs., LLC v. Dem. Repub. of Congo, and Societe Nationale D'Electricite (S.N.E.L.)*, Nos. 1:19-mc-00232-JPO, 1:19-mc-00189-DLC. (S.D.N.Y.).  *See* Gluck Decl., ¶¶ 4-5.

As a result of the above, Plaintiff holds two final, enforceable and unpaid  Judgments against the  Judgment Debtors,  the principal amount of which exceeds $30 million, plus accruing interest, and the Judgments are fully enforceable as if they were issued by this Court.

## ARGUMENT

## I.    THE JUDGMENTS ARE ENFORCEABLE AS IF ENTERED BY THIS COURT

When a judgment is registered in a federal district court other than the court in which it was rendered, the judgment has "the same effect as a judgment of the district court of the district where registered and may be enforced in like manner."  28 U.S.C. § 1963.  The purpose of this rule is "to enable a successful litigant to enforce a money judgment in a District Court other than that which rendered the judgment without the necessity of instituting a *de novo* action."  *See Squeez-a-Purse Corp. v. Stiller*, 31 F.R.D. 261, 263 (S.D.N.Y. 1962).  Here, the 2015 D.C. District Court Judgment was registered in the Southern District of New York in November 2019.  For enforcement purposes, the Judgments are the same as if this Court had rendered them.  *Hassett v. Goetzmann*, Misc. No. 2867, 1992 US Dist.  LEXIS 13218, at *8 (N.D.N.Y. Sept. 1, 1992).

## II.    A WRIT OF EXECUTION SHOULD ISSUE IMMEDIATELY

A writ of execution is a necessary first step to effectuate judgment enforcement in federal court. *See Smith v. FRB*, 346 F.3d 264, 269 (2d Cir. 2003) (citing Fed. R. Civ. P. 69(a) ("A money judgment is enforced by a writ of execution, unless the court directs otherwise.  The procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies.").  Writs of execution do not automatically affect the transfer of ownership

from a judgment debtor to the judgment creditor.  FRCP 69; *see also Fid. Partners, Inc. v. Philippine Export and Foreign Loan Guar. Corp.*, 921 F. Supp. 1113, 1115-16 (S.D.N.Y. 1996) (judgment creditor granted an order to show cause for an order of execution against sovereign instrumentality under FSIA § 1610(c) and FRCP 69).  Rather, writs of execution permit the judgment creditor to pursue assets of the judgment debtor through execution by the U.S. Marshals.

Thus, Plaintiff seeks a writ of execution for delivery to the United States Marshals Service of the Southern District of New York ("USMS").  Once entered, the writ of execution will permit Plaintiff, through USMS, to enforce the Judgments throughout New York.  *See Blue Angel Cap. I v. The Republic Of Argentina.*, No. 1:07-cv-02693, 2008 WL 8449425 (S.D.N.Y. Oct. 30, 2008) (citing 12 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure: Civil 2d § 3013 (2d ed. 1997) (writ of execution or equivalent is required in each state to start to enforce a judgment)).

## III.   RESTRAINING DRC ASSETS IS PERMISSIBLE UNDER APPLICABLE LAW

### A.   Assets Held In The Name Of The DRC Mission and the Co-Conspirators Are DRC Property And Subject To Restraining Notices

The DRC Mission is an arm of the DRC and meets the definition of a "foreign state" under the FSIA.  28 U.S.C. §1610(a); *see also* 28 U.S.C. §1603(a) (defining "foreign state" for purposes of the FSIA to include "a political subdivision of a foreign state"); HR R. No, 94-1487, at 15 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6613 (under the FSIA, "all governmental units beneath the central government" will be considered part of the foreign state itself).  As the Second Circuit has recognized, "the fact of an internal separation of some sort between the sovereign and one or more of its organs has been found to be of no legal significance."  *Compagnie Noga D' Imp. et D'exp. SA v. Russian Fed'n*, 361 F.3d 676, 688 (2d Cir. 2004) (cited by *Servaas Inc. v. Republic of Iraq*, 686 F. Supp. 2d 346, 354 (S.D.N.Y. 2010)).  Since the DRC Mission is a political subdivision of the DRC, it is a holder of DRC property in name only.  As a result, the DRC Mission's assets, including the DRC Mission UNFCU Accounts (as defined in the Grossman

Decl.), together with any property of the DRC (*i.e.*, funds) improperly transferred from the DRC

Mission UNFCU Accounts into the personal accounts of the Co-Conspirators (as detailed below),

are property of the DRC and subject to restraint and execution, subject to any restrictions under

the FSIA, as discussed below.

**B.     Restraining Notices Are Available Under FRCP And New York Law To Execute On A Judgment**

Fed. R. Civ. P. 64 provides that "[a]t the commencement of and throughout an action, every

remedy is available that, under the law of the state where the court is located, provides for seizing

a person or property to secure satisfaction of the potential judgment."   In addition, FRCP 69(a)

states that federal judgments are to be enforced "in accordance with the practice and procedure of

the state in which the district court is held."   FRCP 69(a); *United States v. Vulpis*, 967 F.2d 734,

736 (2d Cir. 1992).   In New York, "[t]he current process of enforcing money judgments begins

when the attorney for the judgment creditor issues a restraining notice to the holder of the judgment

debtor's property."   *McCahey v. L.P. Investors*, 774 F.2d 543, 546 (2d Cir. 1985); *Gadsby &

Hannah v. Romania*, 698 F. Supp. 483, 486 (S.D.N.Y. 1988) ("Plaintiff law firm may seek a court

order for attachment of the bank accounts maintained in New York [by the judgment debtor]").

Restraining notices apply to prevent a recipient from making a payment to a judgment

debtor so that the payment, if appropriate, may be paid to the judgment creditor to satisfy the

judgment (or part thereof).   CPLR § 5222 provides, in pertinent part:

> A restraining notice may be issued by the clerk of the court or the
> attorney for the judgment creditor as officer of the court, or by the
> support collection unit designated by the appropriate social services
> district. . . . It shall be served personally in the same manner as a
> summons or by registered or certified mail, return receipt requested
> or if issued by the support collection unit, by regular mail, or by
> electronic means as set forth in subdivision (g) of this section.   It
> shall specify all  the parties to the action, the date that the judgment
> or order was entered, the court in which it was entered, the amount
> of the judgment or order and the amount then due thereon, the names
> of all parties in whose favor and against whom the judgment or order
> was entered, it shall set forth subdivision (b) and shall state that
> disobedience is punishable as a contempt of court, and it shall

6

> contain an original signature or copy of the original signature of the
> clerk of the court or attorney or the name of the support collection
> unit which issued it.

Plaintiff's multi-year investigation revealed the existence of DRC property that should be restrained under CPLR § 5222 to preserve DRC's assets for judgment enforcement, including the DRC Mission UNFCU Accounts and the personal accounts of the Co-Conspirators held at TD Bank and the UNFCU into which embezzled DRC assets—including the embezzled UN reimbursements owed to the DRC—have been paid.

### C.    Restraining Notices Are Permitted Under the FSIA

FSIA § 1610, Fed. R. Civ. P. 64 and 69, and CPLR § 5222 permit this Court to order the issuance of the restraining notices set forth in Gluck Decl., Exs. 5 and 6.  Although restraining notices can typically be served by the clerk or attorney of record, because the DRC is a foreign sovereign the FSIA requires that restraining notices be authorized by court order.  28 U.S.C. § 1610 (c) (no post-judgment attachment or execution "shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following entry of judgment"); *see Walters v. Indus. & Commer. Bank of China, Ltd.*, 651 F.3d 280, 291 (2d Cir. 2011); *First City, Texas-Houston, N.A. v. Rafidain Bank*, 197 F.R.D. 250, 256 (S.D.N.Y. 2000) (restraining notices against the property of sovereign instrumentality must be authorized by court order); *Trans Commodities, Inc. v. Kazakstan Trading House, S.A.*, No. 96 Civ. 9782 (BSJ), 1997 US Dist. LEXIS 23906, at *8 (S.D.N.Y. 1997) (same).

Three requirements must be met to restrain financial accounts or any other property of a foreign sovereign under the FSIA.  First, the Judgments must have been outstanding and unpaid for more than "a reasonable period of time."  28 U.S.C. §1610(c).  Second, the DRC Mission Account, at least in part (here, it was used in large measure), and the DRC funds that were misappropriated and put into the Co-Conspirators personal bank accounts, must have been used for "commercial activity in the United States."  28 U.S.C. §1610(a).  Third, the movant must satisfy one of the criteria under 28 U.S.C. §1610(a).  Here, the Judgments have been outstanding for more

than ten years, which is far more than the "reasonable period of time" required by FSIA.  The DRC Mission UNFCU Accounts, and the DRC funds embezzled by the Co-Conspirators, have been used for "commercial activity in the United States."  28 U.S.C. §1610(a).  Finally, the Judgments are based on orders confirming arbitral awards rendered against the foreign state.  28 U.S.C. §1610(a)(6).

**1.** ***The DRC Mission Account and the Co-Conspirator's Personal Bank Accounts Should Be Restrained Because The Judgments Resulted From a Foreign Arbitral Award and DRC Mission Account and the DRC property in the Co-Conspirator's Bank Accounts Were All Used for Commercial Activity In the United States.***

**a)** ***Foreign Arbitral Awards***

Provided that it has been or is being "used for a commercial activity in the United States", the DRC's property in this case is subject to execution because the property of a foreign sovereign in the United States is subject to execution where the judgment sought to be enforced is based on orders confirming an arbitral award rendered against the foreign state.  28 U.S.C. §1610(a)(6).

**b)** ***The Commercial Activity Exception***

The DRC Mission Accounts and the DRC funds that were improperly transferred into the Co-Conspirators' personal bank accounts are not immune from execution under the FSIA because the DRC Mission UNFCU Accounts, the DRC funds held therein, the embezzled DRC funds held in the Co-Conspirators' accounts, and the other assets and real property acquired with such embezzled funds, were used for commercial activity in the United States.  Section 1610(a)(1), the "Commercial Activity Exception", of the FSIA provides the following:

> The property in the United States of a foreign state . . . used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States . . .

28 USC § 1610(a)(1).

"Commercial activity" is defined as "either a regular course of commercial conduct or a particular commercial transaction or act."  And "the commercial character of an activity shall be

determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(d); *see Saudi Arabia v. Nelson*, 507 U.S. 349, 358-59 (1993) (cited by *Petersen Energía Inversora S.A.U. v. Argentine Republic*, 895 F.3d 194, 204-05 (2d Cir. 2018)).   Commercial activity can include a breach of contract or fraudulent conduct because it extends to any "type of activity in which a private player within the market engages."  *De Csepel v. Rep. of Hungary*, 714 F.3d 591, 599 (D.C. Cir. 2013) (explaining that a state engages in "commercial activity . . . where it acts "in the manner of a private player within the market . . . [or] where it exercises "only those powers that can also be exercised by private citizens," as distinct from those "powers peculiar to sovereigns.") (internal quotation marks omitted).   By embezzling and misappropriating state funds, and transferring those funds to the private bank accounts of individuals for purely commercial purposes including, but not limited to, earning interest on deposits in savings accounts, purchasing residential real estate, paying credit cards, tuition and mortgage payments, *supra*, the DRC is not acting in a manner "peculiar to a sovereign" but, instead, acting like a "private player within the market[.]"  *Id.*  This behavior places the DRC's property beyond the protection of the FSIA.  *Id.*; *see also Republic of Argentina v. Weltover, Inc.*, 504 US 607, 614 (1992) ("when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA.")

### c) *Illegal Activity*

The FSIA does not extend protections to illegal activity that is commercial in nature.  *See Kensington Int'l Ltd. v. Societe Nationale des Petroles du Congo*, 05 Civ. 5101 (LAP), 2006 US Dist. LEXIS 14264, at *41 (S.D.N.Y. Mar. 31, 2006) *abrogated on other grounds*, *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147 (2d Cir. 2007).   Courts have deemed a number of illegal activities "commercial" and beyond the scope of protection under the FSIA.  *See Pablo Star Ltd. v. Welsh Gov't*, 378 F. Supp. 3d 300, 314 (S.D.N.Y. 2019), *aff'd*, 961 F.3d 555 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 1069, 208 L. Ed. 2d 531 (2021) (finding that the Welsh government was not protected

by the FSIA because an alleged copyright violation constituted "commercial activity"); *Adler v. Fed. Republic of Nigeria*, 219 F.3d 869, 874-75 (9th Cir. 2000) (finding that an illegal contract to convert Nigerian government funds for certain government officials' personal use was "commercial" activity beyond the protections of the FSIA); *Adler v. Federal Republic of Nigeria*, 219 F.3d 869, 875 (9th Cir. 2000) ("The fact that the contract was for an illegal purpose, and therefore was unenforceable, does nothing to destroy its commercial nature."); *Southway v. Central Bank of Nigeria*, 198 F.3d 1210, 1217 (10th Cir. 1999) ("Simply because the activities of a 'foreign state' are illegal . . . does not mean those activities can never be commercial in nature or connected with a commercial activity."); *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 167-68 (D.C. Cir. 1994) (suggesting that the illegal character of alleged acts may be irrelevant in judging their commercial character under the FSIA).  Proceeds and funds used in connection with criminal activity that is commercial in nature—such as money laundering—is within the commercial activity exception.  *See Nelson*, 507 U.S. at 356; *De Letelier v. Republic of Chile*, 748 F.2d 790, 797 (2d Cir. 1984) (explaining that the criminal nature of an activity under the FSIA is irrelevant and the "court must inquire whether the activity is of the type an individual would customarily carry on for profit").

The DRC Embezzlement Enterprise, which was orchestrated by, among others, the then President of the country, Kabila, together with other governmental officials, including, without limitation, the Co-Conspirators, used the DRC Mission as a diplomatic veil and shield to orchestrate a wide-ranging scheme to illegally siphon UN funds intended for the DRC state for private gain.  *See* Grossman Decl., ¶¶ 3-9, 32-53.  The DRC Mission Accounts were thus used for commercial purposes in the United States.  Co-Conspirator Gata, who had almost exclusive control over the DRC Mission Accounts, used his position as a signatory on these accounts containing DRC funds to carry out private, classically commercial activities such as, *inter alia*, the transfer of DRC funds to his and the other Co-Conspirators' personal accounts, the diversion of funds to accounts benefitting family and close associates of the then DRC President, Kabila, and the illegal

characterization and description of fed wires to cloak the true purpose and use of the funds being transferred or withdrawn from the DRC Mission Accounts. *Id.* The DRC property that was diverted into Gata and the other Co-Conspirators' personal bank accounts were similarly used for classically commercial activities (as described below).

The use of the DRC Mission Account only served to obfuscate and improperly shield DRC funds from garnishment or attachment by the Plaintiff in furtherance of enforcement of the Judgments, while simultaneously diverting DRC property (*i.e.*, funds) to private parties, including the family members and associates of the head of state at that time. *See* Grossman Decl., ¶¶ 24, 36, 57. Logic dictates that any DRC funds that Gata has transferred into his own personal bank accounts and those of his Co-Conspirators were part and parcel of the overall DRC Embezzlement Enterprise, which permitted Gata to do so in order to ensure his and the other Co-Conspirators' essential assistance with the scheme through which at least $6.8 million were embezzled by Kabila's family and close associates. *Id.*, ¶¶ 29-36, 54-57.

### d) *Public Purpose Expenditures*

Again, Plaintiff's investigation revealed that DRC property has been transferred to the various beneficiaries of the DRC Embezzlement Enterprise, including the Co-Conspirators, while the DRC has continued to frustrate enforcement of the Judgments. *See* Grossman Decl., ¶¶ 17, 37, 40-53. As but one of the many examples described in the Grossman Decl. of the kind of commercial activity for such the DRC Mission Accounts have been used, a $6.8 million wire transfer from the DRC Mission Accounts was fraudulently underlined as a payment to the DRC Central Bank, when in fact the funds were credited to the account of a company owned by Kabila's sister and sister-in-law. *See* Grossman Decl., ¶ 26. Similarly, the Co-Conspirators orchestrated the payment of several million dollars from the DRC Mission Accounts to their own personal bank accounts in New York, fraudulently describing some of the payments as purported "pension" payments. *See* Grossman Decl., ¶¶ 25-28, 51 (a) - (e). Gata used some of the $2.6 million he embezzled from the DRC Mission Accounts to purchase real estate in Pennsylvania, pay credit

cards, earn interest in his personal savings account, pay tuition and otherwise undertake a variety of classically commercial activities, all with the evident approval and participation of those at the highest levels of the DRC government. *Id.*, ¶¶ 28.

The DRC funds embezzled through the DRC Mission Account originated with UN peacekeeping reimbursements owed to the DRC. *Id.* at ¶¶ 17, 37, 40-53. That is, millions of dollars owed by the UN to the DRC (*i.e.*, the DRC's property) were deposited into the DRC Mission Accounts which was used as a conduit for the conversion of such funds and then held solely for the benefit of, and ultimately transferred to, the private accounts of the individuals who were beneficiaries of the DRC Embezzlement Enterprise. *Id.* In short, the DRC Mission, the DRC Mission Accounts and Gata's purported diplomatic status and purpose, were perverted to camouflage and obscure the illicit maneuverings of a renowned kleptocracy, using the U.S. financial system and the DRC Mission's purported sovereign status as an instrument to veil a criminal enterprise. *Id.* Thus, the DRC Mission Accounts and the accounts of the Co-Conspirators are subject to attachment. *See Birch Shipping Corp. v. Emb. United Rep. of Tanzania*, 507 F. Supp. 311, 311 (D.C. Cir. Nov. 18, 1980).

In *Birch Shipping*, the Court detailed the legislative history of the FSIA while attaching a checking account of the Republic of Tanzania in aid of execution of a foreign arbitral award where the account was used for the "commercial activity" of paying for "public purpose" expenditures:

> The legislative history of the Foreign Sovereign 'Immunity's Acts makes it clear that, even where a foreign sovereign engages in purchases in furtherance of its diplomatic mission, such transactions satisfy the statutory definition of "commercial activity" set forth in 28 U.S.C. et. seq. 1603(d): "As the definition indicates, the fact that goods or services to be procured through a contract are to be used for a public purpose is irrelevant; it is the essentially commercial nature of an activity or transaction that is critical. Thus, a contract by a foreign government to buy provisions or equipment for its armed forces or to construct a government building constitutes a commercial activity. The same would be true of a contract to make repairs on an embassy building. Such contracts should be considered to be commercial contracts, even if their ultimate object is to further a public function . . . [t]he courts would have a great deal of latitude in determining what is a '''commercial activity' for purposes of this bill. . . . Activities such as a foreign 'government's sale of a service or a product, its leasing of property, its borrowing

of money, its employment or engagement of laborers, clerical staff or public relations or marketing agents, or its investment in a security of an American corporation, would be among those included within the definition". H.Rep. No. 94-1487, 94th Cong. 2d Sess., reprinted in [1976] U.S. Code Cong. & Ad. News 6604 at 6615.

*Id.* at 312-313. *Birch Shipping*, and the FSIA's legislative history cited therein, highlights how the DRC Mission Accounts, and the DRC's property in those accounts (*i.e.*, the funds), as well as the funds that were transferred out of that account by an agent of the DRC, with the tacit (and likely explicit) approval of the then head of state (considering his family and close associate were the primary beneficiaries of these schemes), into the personal accounts of the Co-Conspirators, all fall within the "commercial activity" exception to immunity. As such, the transferred funds within the Co-Conspirators' accounts are subject to enforcement, as is the content of the DRC Mission account itself.

With respect to the DRC Mission Account, *Birch Shipping* established that governments need to segregate accounts used for "sovereign activity" and those used for "commercial activity" to avoid subjecting the whole of the account to garnishment. *Id.* Thus, even where a government bank account is predominantly used for sovereign activity, use of that account for non-sovereign commercial transactions (leasing property, borrowing money, paying for clerical staff or public relations, or investing in securities of an American corporation) subjects the entire account to attachment. *Id.* at 313 ("[A] reading of the Act which exempted *mixed accounts would create a loophole*, for any property could be made immune by using it, at one time or another, for some minor public purpose. Defendant asserts, however, that failure to find this property immune will make it impossible for foreign countries to maintain embassies. Even if it could be shown this was actually a problem, the solution would not be the broad immunity defendant asks, but segregation of public purpose funds from commercial activity funds . . .") (emphasis added). Thus, regarding the DRC Mission Accounts, it is without question that the DRC engaged in commercial activity by effecting millions of dollars of transactions for the private benefit of DRC officials, including family and associates of the then President and the Co-Conspirators.

It is important to distinguish that the <u>accounts</u> of the Co-Conspirators do not require any analysis under the FSIA of the particular use to which these accounts were put, as they are not DRC accounts and therefore do not attract immunity under the FSIA.  These are personal bank accounts that happen to hold within them embezzled property of the DRC.  Rather, it is only the content of those accounts and the proceeds of the illicit schemes that even arguably fall within the FSIA (and in that regard, fall clearly within the commercial activity exception).  For the avoidance of doubt, however, Plaintiff has uncovered no evidence that the Co-Conspirators were acting as agents of the DRC and using such accounts to make sovereign expenditures on the DRC's behalf (*i.e.*, paying the DRC's UN dues, etc.).  Rather, the accounts were used solely for their own, personal benefit.  *See* Grossman Decl. ¶ 36.  For these reasons, the DRC property in question here, being the funds in the DRC Mission Accounts and the funds transferred into the Co-Conspirators' accounts (up to the amounts shown to have been embezzled by each Co-Conspirator, plus interest) and proceeds thereof, are not immune from the restraining notices or, ultimately, turnover under CPLR 5225(b) in satisfaction of the Judgments.

### e)   *Investment Activity*

In determining the commercial character of a particular activity, the FSIA directs courts to look to the activity's nature rather than its purpose.  28 U.S.C. § 1603(d).  Investment activity (including liquid investments in savings or checking accounts) is a signature example of "commercial activity" under the FSIA.  28 U.S.C. § 1610(a)(1).

The non-state economic transactions evidenced between the DRC Mission Accounts are examples of fraudulent transfers and corrupt non-state commercial dealing that subject embezzled DRC property—whether still in the hands of the DRC Mission, or in the hands of the Co-Conspirators—to restraint and attachment in aid of executing an arbitral award.  Accordingly, to the extent that the DRC Mission Accounts, or the New York bank accounts of the Co-Conspirators and the funds therein and proceeds thereof, are part of transactions bearing prominent badges of fraud and embezzlement, they are subject to attachment under the FSIA's "commercial activity"

exception.  *See Rep. of Arg. v. Weltover, Inc.*, 504 U.S. 607, 614 (1992); *see also Tex. Trading & Milling Corp. v. Fed. Rep. of Nig.*, 647 F.2d 300, 309 (2d Cir. 1981) ("[I]f the activity is one in which a private person could engage, it is not entitled to immunity."); *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Rep.*, 877 F.2d 574, 578 (7th Cir. 1989) ("If a private person could have engaged in the same type of activity, then the sovereign has presumptively engaged in 'commercial activity' within the meaning of the FSIA[.]").

### f)    Restraining Notices

Plaintiff has provided this Court with sufficient information to order the issuance of restraining notices against the DRC's property.  *See FG Hemisphere Assocs., LLC v. République du Congo*, 455 F.3d 575, 594 (5th Cir. 2006) ("[P]rior to issuing a garnishment order, a district court must make factual findings that support application of the § 1610(a) exception to executional immunity, and therefore, the court must determine the location of each form of property at time of issuance of the order to ensure that it governs property located in the United States") (brackets and internal quotation marks omitted); *Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 797 (7th Cir. 2011) ("[A] judgment creditor seeking to invoke an exception to § 1609 immunity must first identify the property on which it seeks to execute"); *Olympic Chartering S.A. v. Ministry of Indus. & Trade of Jordan*, 134 F. Supp. 2d 528, 536 (S.D.N.Y. 2001) ("since the plaintiff in the instant case has not identified any specific assets in its motion, the Court cannot adequately review the propriety of attaching the assets of the judgment-debtor" to satisfy § 1610(c)); *Trans Commodities, Inc. v. Kazakstan Trading House*, S.A., No. 96 Civ. 9782, 1997 WL 811474, at *3 (S.D.N.Y. May 29, 1997) (vacating restraining notice because no court had specifically passed upon the propriety of attaching funds to satisfy § 1610(c)).

The DRC property includes, inter alia, (i) the DRC Mission UNFCU Accounts, (ii) the funds wrongfully transferred into the Gata UNFCU Accounts and proceeds thereof, plus interest, and (iii) the funds wrongfully transferred into the UNFCU and TD Bank accounts of the Co-Conspirators—Empole, Liolocha, Mfulu, Mpinga, and Ngung—up to the amount of the wrongful

transfers plus interest.  *See* Grossman Decl., ¶¶ 29, 37, 53.  As noted, of these accounts, only the DRC Mission Account even arguably triggers FSIA immunity and exception analysis.  The remainder of the accounts are private accounts.  By contrast, all the *underline: funds and proceeds of funds* representing property of the DRC that ended up in the Gata UNFCU Accounts and the Co-Conspirators accounts may trigger *prima facie* FSIA immunity because such funds are property of the DRC, but for the reasons above, all such funds and proceeds of funds clearly fall within the commercial activity exception to the FSIA.  *Birch Shipping Corp. v. Emb. of United Republic of Tanzania*, 507 F. Supp. 311, 311 (D.C. Cir. Nov. 18, 1980) (permitting a writ of garnishment against a government bank account used for "commercial activity").  *A fortiori,* a restraining notice is permissible against sovereign funds being used for commercial activity that are in a non-government bank account.

### g)       *A Reasonable Period of Time*

Notwithstanding the applicability of the Commercial Activity Exception, the FSIA further requires that a reasonable period of time has passed, following the judgment, before the property of a foreign sovereign can be attached.  28 U.S.C. § 1610(c).  While the statute does not define "reasonable period of time," the determination of whether a reasonable period of time has elapsed is largely left to the courts.  *See Pharo Gaia Fund Ltd. v. Bolivarian Rep. of Venezuela*, No. 18 CIV. 11940, 2021 WL 2168916, at *1 (S.D.N.Y. May 27, 2021); *Ned Chartering & Trading, Inc. v. Republic of Pakistan*, 130 F. Supp. 2d 64, 67 (D.C. Cir. 2001) ("the period of 'reasonable time' will of course vary according to the nuances of each case"); *Balkan Energy Ltd. v. Republic of Ghana*, 302 F. Supp. 3d 144, 148-49 (D.C. Cir. 2018) (finding that a "reasonable period of time" had elapsed when there was four years between the arbitration award and a successful motion to authorize attachment and execution).[3]

---

[3] Courts have deemed periods of less than a year as a reasonable period of time.  *See OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 419 F. Supp. 3d 51 (D.C. Cir 2019); *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. 16 Civ. 661, 2017 WL 6349729 (D.C. Cir. June 9, 2017).  Moreover, periods of six months or less have satisfied the statutory requirement that a reasonable period of time has passed.  *Owens v. Republic of Sudan*, 141 F. Supp. 3d

Nearly two decades have passed since the DRC first received notice of its judgment obligations.  *See* Grossman Decl., ¶ 3.  Yet, Plaintiff's Judgments remain unsatisfied.  *Id.*  Thus, Plaintiff respectfully requests authorization from this Court to serve restraining notices upon the aforementioned banks pursuant to FSIA § 1610, FRCP 64 and 69, and CPLR § 5222.

### D.   Expedited Discovery Is Appropriate To Demonstrate the Embezzlement Scheme, Identify Additional Non-Immune Assets and Restrain Additional Dissipation Of DRC Funds

In addition to property located within this jurisdiction, Plaintiff seeks to prevent the DRC from taking steps to evade its debt obligations elsewhere.  CPLR § 5201 permits enforcement of a money judgment against "any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested[.]"  The DRC has evaded the Judgments by, among other things, participating in the DRC Embezzlement Enterprise and dissipating and transferring property to third parties, including the Co-Conspirators.  *See* Grossman Decl., ¶¶ 17, 37, 40-53.  Thus, the DRC has exercised an ability to "assign or transfer" property, and Plaintiff has a right to enforce its Judgments against the DRC's property.  *See* CPLR §§ 5201, 5225, 5232.  Given this Court's jurisdiction over the DRC, Plaintiff may also issue restraining notices on DRC property in other districts.  *Koehler v. Bank of Berm., Ltd.*, 544 F.3d 78, 85 (2d Cir. 2008) (citing *Gryphon Dom. VI, L.L.C. v. APP Int'l. Fin. Co., B.V.*, 41 A.D.3d 25 (1st Dep't 2007) (holding that a court in New York can order a judgment debtor, over whom it has personal jurisdiction, to turn over out-of-state assets under CPLR § 5225(a)).

Plaintiff seeks expedited discovery under Fed. R. Civ. P. 69 from the DRC—and its related entities and agents—to identify the location of any other property in the United States, including additional garnishees that may ultimately be served with restraining notices and writs of execution. *Ayyash v. Bank Al-Madina*, No. 04 Civ. 9201 (GEL), 233 F.R.D. 325, 327 (S.D.N.Y. Jul. 12, 2005)

---

1, 9 (D.C. Cir. 2015) (three months); *Ned Chartering*, 130 F. Supp. 2d at 67 (six weeks); *Peterson v. Republic of Iran*, No. 10 Civ. 4518 (KBF), 2013 WL 1155576, at *35 (S.D.N.Y. Mar. 13, 2013) (finding approximately sixth months to be sufficient); *Gadsby & Hannah v. Socialist Republic of Romania*, 698 F. Supp. 483, 486 (S.D.N.Y. 1988) (two months).

(granting expedited discovery after "consideration of the fact that defendants are foreign individuals and corporations who have both incentive and capacity to hide their assets" and determining that "there is considerable urgency to plaintiff's need to seek information about the location of 'defendants' possible assets within the United States").

E.    **Plaintiff Is Likely To Obtain Ultimate Relief**

Post-judgment restraining notices typically issue automatically as a "procedure on execution." CPLR § 5222. As a result, consistent with Fed. R. Civ. P. 64 and 69, Plaintiff should be permitted to serve restraining notices as a matter of right. *Id.* However, Plaintiff would still satisfy its burden for a temporary restraint of DRC's bank accounts even if held to a heightened standard. *See Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (finding that the court did not abuse its discretion in granting a restraining order when the evidence showed defendant failed to comply with its obligations). To obtain a temporary restraining order, a party must ordinarily show (1) that it will suffer irreparable harm and (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping in the movant's favor. *Id.* Here, Plaintiff has suffered significant harm as a result of the DRC's prolonged judgment evasion. Further, the merits of the Judgments against the DRC have been proven before arbitral tribunals in Switzerland and France, and the arbitral awards have been registered and upheld by the D.C. District Court, as well as by this Court. *See* Gluck Decl., ¶¶ 2-5.

There is good cause to grant the relief sought because the DRC's longstanding refusal to honor the Judgments, with impunity, demonstrates blatant contempt for this Court's orders. Absent immediate restraint of the DRC's assets, the DRC, the DRC Embezzlement Enterprise, the Co-Conspirators, or any one of them, are likely to continue to frustrate the Judgments and dissipate assets, causing Plaintiff to suffer irreparable harm. *See Westchester Fire Insurance Company v. DeNovo Constructors, Inc.*, 177 F. Supp. 3d 810, 812 (S.D.N.Y. 2016) (citing *Fireman's Ins. Co.*

18

*v. Keating*, 753 F. Supp. 1146, 1153 (S.D.N.Y. 1990) ("[injunctive relief proper where] non-movant's assets may be dissipated before final relief can be granted")).

**IV.    TURNOVER OF DRC ASSETS HELD BY A GARNISHEE IS WARRANTED AND PERMISSIBLE UNDER THE FSIA AND ARTICLE 52 OF THE CPLR**

Because neither the DRC nor its subdivision, nor the DRC property in the personal accounts of the Co-Conspirators,  are immune under the FSIA, this Court also has the power to authorize a turnover, pursuant to CPLR § 5225(b) and 5227, of, *inter alia*, DRC assets held within the DRC Mission Accounts and those of the Co-Conspirators, including the Gata UNFCU Accounts and TD Bank account, and the other Co-Conspirators' UNFCU accounts (Empole, Liolocha, Mfulu, Mpinga, and Ngung).  Here, the relevant garnishees are UNFCU and TD Bank.

The use of DRC funds in the DRC Mission Accounts for "commercial activity" (Grossman Decl., ¶¶ 17, 37, 40-53) make them subject to turnover under CPLR §§ 5225(b) and 5227 in satisfaction of Plaintiff's arbitral awards.  *Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 423 F. Supp. 3d 45 (S.D.N.Y. 2019) (assets of a Venezuelan government-controlled entity subject to turnover under the Commercial Activity Exception in satisfaction of an arbitral award).  In *Ferrominera*, the plaintiff creditor ("FME") held an arbitral award for breach of contract against an entity controlled by the Venezuelan government ("CMO").  *Id.*  Further, CMO had a New York bank account used to pay U.S. commercial vendors for goods, equipment, and mining of iron ore related services.  *Id.*  The court, citing *Weltover*, found that the manner in which CMO used its bank account constituted commercial activity because using a bank account to pay vendors for equipment or services is the type of transaction private parties can engage in.  *Id.*  Upon confirmation of the arbitral award, the district court held that the funds held in the Venezuelan entity's New York bank account were not protected under the FSIA (and, thus, subject to a turnover order) for two reasons: (i) they had been used for "commercial activity", and (ii) they were subject to an arbitral award.  *Id.*  As in *Ferrominera*, the DRC's funds in question here are subject to turnover because they have been used for commercial activity and are the subject of an arbitral

award.  Similarly, the use of the DRC property in the personal accounts of the Co-Conspirators for commercial activity in the United States also makes them subject to turnover under CPLR §§ 5225(b) and 5227 in satisfaction of Plaintiff's arbitral awards.  28 U.S.C. § 1610 (a).

### A.        The Statutory Basis For Turnover Proceedings

A discussed, *supra* at Sections II & III(B), because this proceeding is in aid of execution, it is governed by Article 52 of the CPLR, which sets forth the practice and procedure for the enforcement of judgments in the State of New York.  *See, e.g., Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 190 F.3d 16, 20-21 (2d Cir. 1999); *Beauvais v. Allegiance Sec., Inc.*, 942 F.2d 838, 840 (2d Cir. 1991).  Under New York law, a judgment creditor may institute a turnover proceeding requiring a third party to turn over any money or property it holds for a judgment debtor.  *See* CPLR §§ 5225(b) and 5227.  Here, Plaintiff seeks turnover of the assets in custody of the UNFCU and TD Bank—to wit the content of the DRC Mission's UNFCU Accounts and/or the Gata UNFCU Accounts and TD Bank accounts, and the other Co-Conspirators' UNFCU accounts (Empole, Liolocha, Mfulu, Mpinga, and Ngung).  CPLR § 5225(b), which provides the procedure for obtaining a turnover of the judgment debtor's property in the possession or custody of a third party, in pertinent part, provides:

> Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest ... where it is shown that the judgment debtor is entitled to the possession of such property ... the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor and, if the amount to be so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sheriff.... Notice of the proceeding shall also be served upon the judgment debtor in the same manner as a summons or by registered or certified mail, return receipt requested.  The court may permit the judgment debtor to intervene in the proceeding.

CPLR § 5227, which provides the procedure for obtaining a turnover of "debts" owed to the judgment debtor in the possession or custody of a third party, in pertinent part, provides:

> Upon a special proceeding commenced by the judgment creditor, against any person who it is shown is or will become indebted to the judgment debtor, the court

may require such person to pay to the judgment creditor the debt upon maturity, or so much of it as is sufficient to satisfy the judgment ... or it may direct that a judgment be entered against such person in favor of the judgment creditor .... Notice of the proceeding shall also be served upon the judgment debtor in the same manner as a summons or by registered or certified mail, return receipt requested. . . .

The courts have held that CPLR §§ 5225(b) and 5227 are "essentially interchangeable." *CSX Transportation, Inc. v. Emjay Environmental Recycling, Ltd.,* 12-CV-1865 (JS) (AKT), 2016 WL 755630, *3 (E.D.N.Y. Feb. 25, 2016) (citing *LaBarbera v. Audax Constr. Corp.,* 971 F. Supp.2d 273, 278 (E.D.N.Y. 2013)). Moreover, CPLR §§ 5225(b) and 5227 have been used as the statutory basis to turn over monies in an account. *See, e.g.,* *Centerpointe Corporate Park Partnership 350 v. MONY*, 96 A.D.3d 1401 (4th Dep't 2012) (turnover order granted under CPLR § 5225(b) to obtain funds held in escrow by MONY); 4A N.Y. Prac., *Com. Litig. In New York State Courts* § 58:24 (4th ed. 2015) ("A judgment creditor may initiate a turnover proceeding under CPLR 5227 to obtain the proceeds of a joint back account in which the judgment debtor is one of the two joint tenants").

CPLR §§ 5225(b) and 5227 both contemplate a "special proceeding" where, as here, a judgment creditor seeks a turnover of funds, property or debts not in the possession or custody of the judgment debtor. However, under Federal Rule 69, New York law does not govern to the extent that a federal statute or the FRCP applies. *See Saregama India, Ltd. v. Mosley*, Nos. 12–mc–45–P1, 11–mc–84–P1 (LAK), 2012 WL 955520, at *1 (S.D.N.Y. Mar. 20, 2012). Although CPLR §§ 5225(b) and 5227 each refer to a "special proceeding," judicial authority uniformly holds that the judgment creditor can proceed in federal court by a motion for turnover relief and does not have to institute a separate "special proceeding" to obtain such relief. *See, e.g.,* *Trust v. Kummerfeld*, 153 F. App'x 761, 762-63 (2d Cir. 2005) (authorizing CPLR 5225 relief by motion rather than by separate proceeding); *CSX Transportation, Inc. v. Emjay Environmental Recycling, Ltd.,* 12-CV-1865 (JS) (AKT), 2016 WL 755630, at *3 (E.D.N.Y. Feb. 25, 2016) ("Nearly every court in this Circuit to consider the issue has held that parties can bring a motion under FRCP 69(a), rather than instituting a special proceeding under the New York state law") (citation

omitted); *Mitchell v. Lyons Professional Services, Inc.,* No. 09 Civ. 1587 (BMC), 2010 WL 3018322 (E.D.N.Y. Jul. 29, 2010) (same).

A turnover proceeding may be commenced by motion so long as the court has personal jurisdiction over the third-party garnishee. *See CSX Transportation, Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 468–69 (2d Cir. 2018) ("We now hold that a party seeking a money judgment against a non-party garnishee may proceed by motion and need not commence a special proceeding, as long as the court has personal jurisdiction over the garnishee."); *CSX Transportation, Inc. v. Emjay Environmental Recycling, Ltd.,* 12-CV-1865(JS)(AKT), 2016 WL 755630, at *3, n. 6 ("[T]he court need only have *in personam* jurisdiction over the garnishee [in a turnover proceeding]") (quoting *N. Mariana Islands v. Millard*, 845 F. Supp. 2d 579, 583 (S.D.N.Y. 2012)).  Indisputably, this Court has *in personam* jurisdiction over UNFCU and TD Bank— garnishees located in New York and subject to the jurisdiction of this Court.  Accordingly, the turnover proceeding may be commenced by motion.

**B.   Plaintiff Has Demonstrated Its Entitlement To A Turnover Order Under CPLR §§ 5225(b) and 5227**

The Second Circuit has held that CPLR §§ 5225(b) and 5227 requires a two-step analysis for determining whether property belonging to a judgment debtor—but in the possession of a third party—should be turned over to a judgment creditor. *First,* "the judgment debtor 'has an interest' in the property the creditor seeks to reach." *Beauvais*, 942 F.2d at 840 (quoting *Key Lease Corp. v. Mfrs. Hanover Trust Co.*, 117 A.D.2d 560, 561-62 (1st Dep't 1986). *Second*, the "the judgment debtor is 'entitled to the possession of such property,' *or . . .* 'the judgment creditor's rights to the property are superior' to those of the party in whose possession it is." *Id.*  Plaintiff has satisfied both of these conditions.

*First*, the DRC clearly has an interest in the at-issue funds. *See Beauvais*, 942 F.2d at 841 ("[a] debtor obviously has an interest in its own money or property held by a third party…"). Plaintiff's investigation shows that the UNFCU has multiple accounts (checking and savings) in

the name of the DRC Mission and the Co-Conspirators, and that such accounts hold funds of the DRC. *See* Grossman Decl., ¶¶ 11, 12, 51. Plaintiff is in possession of bank records related to these accounts, which reveal millions of dollars of transfers of DRC money via the DRC Mission Accounts to the Co-Conspirators' bank accounts. *See* Grossman Decl.,¶¶ 12-15, 28-35. The DRC has an interest in the at-issue funds held in the DRC Mission Account and in the DRC property (*i.e.*, funds) in the accounts of any of the Co-Conspirators. The DRC government, as represented by its then President, orchestrated and thus authorized the DRC Embezzlement Enterprise at the time the embezzlement occurred. Plaintiff's investigation revealed that over $25 million in funds owed by the UN to the DRC were held by the DRC Mission Accounts. *See* Grossman Decl., ¶¶ 37-38, 41. Out of these funds, lump sum payments were made, some under the guise of wire transfers going to the DRC Central Bank, that instead went to the family of then-DRC president Kabila. Other DRC funds were transferred to the personal, New York bank accounts of the Co-Conspirators, some under the fraudulent guise of "pension funds" or "supplement to pensions," presumably to ensure the cooperation of the Co-Conspirators. *Id.* at ¶ 39.

    *Second*, for the reasons outlined above, *supra* at Section III, FG is entitled to the enforcement against the funds that were transferred between the DRC Mission and Gata and the other Co-Conspirators. The funds at issue were owed by the UN to the DRC and held by the DRC Mission—not for sovereign or diplomatic purposes—but for the private benefit of certain members of the DRC Embezzlement Enterprise. *See*, *e.g.*, Grossman Decl., ¶¶ 9, 16-17, 28-35, 41. Plaintiff is the holder of two final and enforceable Judgments entered by the D.C. District Court against DRC totaling over $30 million. Gluck Decl. ¶¶ 2-3. Thus, Plaintiff's rights, as a judgment creditor, "are superior to those of the party in whose possession" the assets are.

    Having satisfied the two conditions necessary for turnover, Plaintiff, as a judgment creditor, is entitled to a turnover of the assets in the DRC Mission UNFCU Accounts, the Gata UNFCU Accounts and TD Bank accounts, and the UNFCU accounts of the other Co-Conspirators pursuant to CPLR §§ 5225(b) and/or 5227. Accordingly, the Court should issue an order directing

UNFCU and TD Bank to turn over all DRC assets in the DRC Mission Accounts, Gata's accounts and the accounts of the Co-Conspirators in their possession.  All of the funds in the DRC Mission Account are DRC assets.  The amounts in each of the Co-Conspirators' accounts that are DRC assets consist of all amounts improperly transferred out of the DRC Mission Account into each of the Co-Conspirators personal accounts, all as more fully detailed in the Grossman Decl. ¶¶ 52-53.

## V.   *EX PARTE* PROCEEDINGS ON EXECUTION ARE APPROPRIATE

Writs of execution and subsequent process are typically obtained from a court *ex parte*. *See, e.g.*, *Koehler v. Bank of Bermuda Ltd.*, 544 F.3d 78, 85 (2d Cir. 2008) (citing *Fidelity Partners, Inc. v. Philippine Export and Foreign Loan Guarantee Corp.*, 921 F. Supp. 1113 (S.D.N.Y. 1996) (writ of execution obtained by order to show cause)); *Itel Containers Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro*, No. 90 Civ. 8191 (CES), 1991 US Dist.  LEXIS 827 (S.D.N.Y. Jan. 25, 1991) (even where a judgment has not yet been rendered, *ex parte* attachment is permitted under New York law).  *Ex parte* proceedings are readily accepted in the enforcement of judgments because the post-judgment creditor has a strong interest in prompt and inexpensive satisfaction of the debt evidenced by the judgment.  *Fidelity Partners, Inc.*, 921 F. Supp. at 1115-16.  Where, as here, there is no question about the debtor's liability, the creditor's interests carry more weight in the post-judgment context.  *Id*.  Further, *ex parte* proceedings are appropriate because any delay and expense involved in enforcing the Judgments will further diminish the ultimate value of the recovery.  *Deary v. Guardian Loan Co.*, 534 F. Supp. 1178, 1186 (S.D.N.Y. 1982).

Plaintiff will provide notice of the writ of execution and restraining notices to the DRC, DRC Mission, and the Co-Conspirators immediately after it serves the notices upon garnishees, allowing ample opportunity for them to contest the garnishment.  *See Endicott Johnson Corp. v. Encyclopedia Press*, 266 U.S. 285, 289 (1924) ("[N]o established rule of our system of jurisprudence requires that . . . the judgment debtor be given notice and an opportunity to be heard before the issuance of . . . garnishment") (cited by *McCahey v. L.P. Investors*, 774 F.2d 543, 552 (2d Cir. 1985)).

## **CONCLUSION**

For the foregoing reasons, it is respectfully requested that the Court grant Plaintiff's Motion in its entirety.

Dated: New York, New York
       August 10, 2021

HOLLAND & KNIGHT LLP

By: */s/ Warren E. Gluck, Esq.*

    Warren E. Gluck, Esq.
    Matthew R. DiBlasi, Esq.
    31 West 52nd Street
    New York, NY 10019
    Phone: (212) 513-3200
    warren.gluck@hklaw.com
    matthew.diblasi@hklaw.com

    *Attorneys for Plaintiff-Judgment-Creditor FG Hemisphere Associates, LLC*

25