UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FG HEMISPHERE ASSOCIATES, LLC,

              Plaintiff-Judgment-Creditor,

    v.

DEMOCRATIC REPUBLIC OF CONGO, *et ano*.,

              Defendants-Judgment-Debtors.

19-mc-00232-JPO

**DEFENDANT DEMOCRATIC REPUBLIC OF CONGO'S MEMORANDUM IN
SUPPORT OF MOTION TO MODIFY THIS COURT'S ORDER OF
SEPTEMBER 14, 2021**

Pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, Defendant Democratic Republic of Congo ("Defendant" or "DRC") hereby requests that this Court modify its September 14, 2021 order (the "September 14 Order") to vacate the portions of the Order that authorize execution against the assets of the DRC's Permanent Mission to the United Nations (the "Permanent Mission") and the personal bank accounts of its staff and that require the Permanent Mission and its diplomatic staff to respond to discovery.

I.      INTRODUCTION ...............................................................................................4

II.     THE ACCOUNTS OF DIPLOMATIC AGENTS OF THE PERMANENT MISSION
        ARE NOT SUBJECT TO EXECUTION TO SATISFY THE OBLIGATIONS OF THE
        DRC ..................................................................................................................7

        A.      The Individual Accounts of the Staff Members Are Personal Accounts, Not
                Government Assets, and All Transfers to Those Accounts Were Proper. ...............7

        B.      Staff Member Accounts Are Also Immune from Execution under the Vienna
                Convention ............................................................................................16

        C.      The Individual Accounts Are Also Immune from Execution under the FSIA ......17

        D.      Even if the Funds in the Personal Accounts Belonged to the DRC, Execution
                Against Third Parties Cannot Be Sought Ex Parte under CPLR 5225(b) ..............18

III.    THE ACCOUNTS OF THE PERMANENT MISSION ARE NOT SUBJECT TO
        EXECUTION TO SATISFY THE OBLIGATIONS OF THE DRC ...............................19

        A.      The Permanent Mission Accounts Are Immune from Execution under the
                Vienna Convention ..................................................................................19

IV.     DIPLOMATIC  PERSONNEL  CANNOT  BE  REQUIRED  TO  PROVIDE
        DISCOVERY IN A U.S. LEGAL PROCEEDING ........................................................23

V.      CONCLUSION ....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United Nations*,
   988 F.2d 295 (2d Cir. 1993)..................................................................................20

*Avelar v. J. Cotoia Const. Inc.*,
   No. 11-CV-2172 RRM MDG, 2011 WL 5245206 (E.D.N.Y. Nov. 2, 2011) .........................20

*Bergdorf Goodman, Inc. v. Marine Midland Bank*,
   97 Misc. 2d 311 (N.Y. Civ. Ct. 1978)......................................................................19

*Broidy Capital Mgmt. LLC v. Benomar*,
   944 F.3d 436 (2d. Cir. 2019)..................................................................................16

*Brzak v. United Nations*,
   597 F.3d 107 (2d Cir. 2010)..................................................................................17

*Foxworth v. Permanent Mission of Uganda*,
   796 F. Supp. 761 (S.D.N.Y.1992) ...........................................................................20

*Liberian Eastern Timber Corp. v. The Gov't of the Republic of Liberia*,
   659 F. Supp. 606 (D.D.C.1987)...............................................................................20

*Republic of Philippines v. Pimentel*,
   553 U.S. 851 (2008)..............................................................................................18

*Ruvolo v. Long Island R. R. Co.*,
   45 Misc. 2d 136 (N.Y. Sup. Ct. 1965) .....................................................................19

*Sales v. Republic of Uganda*,
   No. 90-cv-3972, 1993 WL 437772 (S.D.N.Y. 1993) ............................................20, 24

*Samantar v. Yousuf*,
   560 U.S. 305 (2010)........................................................................................17, 18

*Swarna v. Al-Awadi*,
   622 F.3d 123 (2d. Cir. 2010)..............................................................................17, 24

*Thai Lao Lignite (Thailand) Co. v. Gov't of the Lao People's Democratic Republic*,
   No. 10 CIV. 5256 KMW, 2011 WL 4111504 (S.D.N.Y. Sept. 13, 2011)...........................18

**Rules**

CPLR 403(c) .........................................................................................................19

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

CPLR 5225(b)...........................................................................................................................18, 19

Fed. R. Civ. P. 19(a)(1)(B) ...................................................................................................18

# I.    **INTRODUCTION**

In this proceeding, plaintiff FG Hemisphere Associates, LLC, seeks recognition and enforcement of two judgments entered against Defendants arising out of arbitral awards against them.  By *ex parte* application, the Plaintiff filed this proceeding to seek enforcement of the judgments.  However, the Plaintiff not only seeks enforcement against the assets of the Defendants, it also improperly seeks enforcement of the judgments against the assets of the DRC's Permanent Mission to the United Nations, a diplomatic mission entitled to immunity from suit, and the personal assets of members of its staff, which are not assets of the DRC and cannot be subjected to execution for the debts of the Government.

In this motion, the DRC does not contest the September 14 Order to the extent that it authorized execution against the assets of the DRC.  Rather, this motion is solely addressed to the Order insofar as it authorized execution against the assets of, and authorized expedited discovery of, the Permanent Mission and its staff.

By authorizing execution against the assets of the Permanent Mission, the September 14 Order is in direct violation of the Vienna Convention on Diplomatic Relations and Optional Protocols (the "Convention"), which provides for diplomatic immunity from process for the assets of permanent missions.  The courts, including the Second Circuit, have strongly supported the inviolability of assets of permanent missions to the United Nations.  These decisions – not even cited in Plaintiff's *ex parte* application – hold expressly that the bank accounts of a permanent mission are protected by diplomatic immunity.  The September 14 Order cannot be reconciled with the longstanding and well established protections afforded to diplomatic missions.

As set forth in the accompanying declarations of Ignace Gata Mavita wa Lufuta, the former Permanent Representative of the Democratic Republic of Congo to the United Nations ("Ambassador Gata"), and Paul Losoko Efambe Empole, the current Charge d'affaires of the

Permanent Mission, the accounts of the Permanent Mission have been used exclusively for diplomatic purposes. All payments and transfers into and out of the Permanent Mission accounts were appropriate and consistent with DRC law. Therefore, the Permanent Mission's accounts are immune from execution.

Moreover, the September 14 Order's provisions authorizing execution against the personal assets of Permanent Mission Staff are equally unsupportable. The accounts that Plaintiff seeks to execute upon are *personal property* of the employees of the Mission – in many cases the *only* bank account they have. The freezing of their personal accounts has caused them deep financial distress, preventing them from paying for their most basic needs. In light of the relatively small amounts of funds in some of the accounts, it is clear that Plaintiff's goal was not to satisfy the $40 million judgment but to cause maximum pain to vulnerable diplomatic staff members in order to gain leverage in plaintiff's legal dispute with the government.

In its *ex parte* application for relief against the assets of the Permanent Mission and the personal assets of the Mission's employees, plaintiff asserted that the Permanent Mission had engaged in a "conspiracy" to embezzle DRC funds for the benefit of former President Kabila, and had further "embezzled" funds for their own benefit. But these allegations are false, and inconsistent with the facts set forth in is motion.

To the contrary, as set forth in the declarations accompanying this motion, the accounts of the Permanent Mission were used **exclusively** for diplomatic purposes, and never for commercial or unlawful purposes, and the accounts of mission staff are **personal accounts** containing funds that belong entirely to mission employees; have never contained any government funds; and have never been used for misappropriation of any government funds.

Plaintiff's effort to tie the employees of the Permanent Mission to embezzlements by former President Kabila is based on nothing but speculation and wild inference.  It is true that the Permanent Mission received significant amounts of funds as reimbursements for UN Peacekeeping activities in the Central African Republic.  And it is also true that some of the funds were transferred to Kinshasa by the Permanent Mission upon the instructions of the DRC.  However, each of the transfers was made based upon the instructions of the Government of the DRC and, critically, in each case the Permanent Mission properly ordered the funds to be transferred to the Central Bank of the DRC -- not to any third party.  If any such funds were misappropriated by correspondent banks, it was without the involvement or knowledge of any employee of the Permanent Mission.

Similarly, Plaintiff's allegations that Permanent Mission employees' accounts contain funds embezzled from the DRC is wholly inaccurate.  As set forth in the accompanying declarations of each affected Mission staff member, their bank accounts have never contained any government funds, and have never been used to misappropriate any government funds.  Plaintiff's allegation in its *ex parte* application that pension payments to individual staff members were somehow illegitimate is blatant speculation unsupported by any facts, and is definitively rebutted by the declarations submitted herewith.  Each of the transfers was authorized by DRC law and regulation to reimburse the employees for expenses and benefits that were fully documented and long overdue.  Indeed, the transfers were *significantly less than the amounts actually due to the employees and the remaining balances remain unpaid.*

The effort by Plaintiff in this proceeding to gain leverage by improperly freezing staff members' accounts is an attack on the diplomatic function of a foreign sovereign's mission and its diplomatic agents, in clear contravention of U.S. and international law.  Plaintiff's actions not only

threaten the livelihood of the individuals and the diplomatic mission of the Permanent Mission, but it also sets a dangerous precedent that would allow creditors to use diplomatic personnel as pawns in commercial disputes.

Moreover, plaintiff's efforts to obtain discovery from the Permanent Mission and its diplomatic staff cannot be sustained. The Vienna Convention expressly provides that diplomats are immune from discovery, and the September 14 Order should be vacated to the extent it violates established principles of diplomatic immunity.

Based on the declarations and documentary evidence submitted herewith, it is respectfully requested that the Court vacate the portions of the September 14 Order that authorize execution against the assets of the DRC's Permanent Mission to the United Nations and the personal bank accounts of its staff, and that authorize the taking of expedited discovery from the Permanent Mission and its diplomatic staff.

## II.    THE ACCOUNTS OF DIPLOMATIC AGENTS OF THE PERMANENT MISSION ARE NOT SUBJECT TO EXECUTION TO SATISFY THE OBLIGATIONS OF THE DRC

### A.    The Individual Accounts of the Staff Members Are Personal Accounts, Not Government Assets, and All Transfers to Those Accounts Were Proper.

In the September 14 Order, the Court authorized execution on the personal bank accounts of six present and former employees of the Permanent Mission: Ignace Gata Mavita wa Lufuta, Paul Losoko Efambe Empole, Victoria Lieta Liolocha, Hippolyte Kingonzila Mfulu, Bianza Therese Yvette Mpinga, and Marie Huguette Nkus Ngung (the "Mission Employees"). The individual accounts that were subjected to execution under the September 14 Order (the "Mission Employee Accounts") are the personal accounts of the Mission Employees. Gata Declaration, ¶ 30; Empole Declaration, ¶ 11; Liolocha Declaration, ¶ 8; Mfulu Declaration, ¶ 8; Mpinga

Declaration, ¶ 8; Ngung Declaration, ¶ 8. As such, they are not assets of the DRC and cannot be subject of an enforcement proceeding for the collection of debts of the DRC.

As attested to by the accompanying declarations of the Mission Employees, each of the Mission Employee Accounts was a personal account belonging to individual Permanent Mission employees and diplomats. Gata Declaration, ¶ 30; Empole Declaration, ¶ 11; Liolocha Declaration, ¶ 8; Mfulu Declaration, ¶ 8; Mpinga Declaration, ¶ 8; Ngung Declaration, ¶ 8. None of the Mission Employee Accounts contains any funds that properly belong to the DRC. *Id*. None of the Mission Employee Accounts was ever used to misappropriate funds from the DRC. *Id*. Each of the accounts contains exclusively funds that belong to the individual employees and are used solely for their personal purposes, such as payment of rent, groceries, and other personal needs. Gata Declaration, ¶ 30; Empole Declaration, ¶¶ 11-12; Liolocha Declaration, ¶ 8; Mfulu Declaration, ¶ 8; Mpinga Declaration, ¶ 8; Ngung Declaration, ¶ 8.

Plaintiff's effort to portray the individual accounts as part of a conspiracy to embezzle DRC funds is baseless. With respect to five of the six Mission Employees, the sole basis for Plaintiff's claim is that they received payments from the Permanent Mission account labeled "pension funds" or "supplement to pension funds." Grossman Declaration, ¶ 53. However, all of these payments were entirely legitimate payments for pensions and other benefits made to long term employees of the Permanent Mission authorized by the DRC and made pursuant to applicable DRC law and regulations. Gata Declaration, ¶¶ 25-29; Empole Declaration, ¶¶ 6-10; Liolocha Declaration, ¶¶ 3-7; Mfulu Declaration, ¶¶ 3-7; Mpinga Declaration, ¶¶ 3-7; Ngung Declaration, ¶¶ 3-7.

The salaries and benefits of employees of the Permanent Mission are governed by Law 81-003 of 17 July 1981 relating to the status of career personnel in the State public services (the "Act of 1981") (the certified translation of which is attached to the Declaration of Ignace R Gata Mavia

Wa Lufuta as Exhibit 2), as amended by Act No. 16/013 of 15 July 2016 Bearing the Status of the Service Provider Agents Public Authorities of the State (the "2016 Addendum") (the certified translation of which is attached to the Declaration of Ignace R Gata Mavia Wa Lufuta as Exhibit 3), and Circular IV and V Related to the Career Development and to the Benefits Granted to the Diplomatic and Consular Personnel (the certified translation of which is attached to the Declaration of Ignace R Gata Mavia Wa Lufuta as Exhibit 4). Chapter V of the Act of 1981 establishes the remuneration to which public service employees, including the Mission Employees, are entitled. Chapter VI of the Act of 1981 establishes the benefits that are allocated to each individual. These include, but are not limited to, family allowances for dependent children, housing allowances, medical expenses, and transportation costs.  Gata Declaration, Exhibit 2, Act of 2018, Item 39-47; Gata Declaration, Exhibit 3, 2016 Addendum, Section 51-63.  Mission employees are also entitled to pensions based on the length of time that they have been employed by the Mission.  Gata Declaration, Exhibit 2, Act of 1981, Chapter II, Pensions; Gata Declaration, Exhibit 3, 2016 Addendum, Title V, Chapter 2, Pension.

All of the payments received by the Mission Employees were payments for benefits owed to them by the DRC under the laws and regulations of that country, and specifically authorized by the DRC.   Historically, the funds for the operation of the Permanent Mission and the payment of employee expenses and benefits were provided by the DRC in Kinshasa.  Gata Declaration, ¶ 5. However, due to the ongoing war in the DRC and budget constraints, these payments were irregular and infrequent. *Id*. Often, employees would not receive timely payment of benefits or pensions. *Id*. When funds were finally transferred from the DRC to the Permanent Mission account, the Permanent Mission would often have to back pay what was owed to its employees. *Id*. ¶ 14. If it had sufficient funds, it would also make advanced payments, knowing that it was

possible, if not likely, that future payments would be late as well. *Id.* When payments were not made in a timely manner, significant amounts of overdue benefits and expense reimbursements would accumulate. *See, e.g.*, Gata Declaration, ¶ 26; Empole Declaration, ¶ 7; Liolocha Declaration, ¶ 4; Mpinga Declaration, ¶ 4; Ngung Declaration, ¶ 4; Mfulu Declaration, ¶ 4. The late payment of expenses was a continuing issue of concern for the Permanent Mission, resulting in frequent communications between the Permanent Mission and the Ministry of State in Kishasa. Gata Declaration, Exhibits 1 and 5.

By February of 2015, the balance of unpaid expenses was in excess of $16 million. On February 21, 2015, Antoine Boyamba Okombo of the Ministry of Foreign Affairs and International Cooperation wrote to the Minister of State and Minster of Budget of the DRC on behalf of the Permanent Mission with the reference line "Subject: Reminder regarding the payments to be made to the Permanent Mission of the Democratic Republic of the Congo in New York." Gata Declaration, Exhibit 1. In the letter, Mr. Okombo wrote: "Further to the Note No. 132.61/ RDCONU/Al/3/2015 dated February 3, 2015, concerning the problems outlined by our Ambassador to the UN regarding the proper functioning of the mission, I would like to come back to the specific matters mentioned by the Ambassador in order to reiterate the urgency of addressing those issues." The letter outlined a series of overdue expenses, including funds needed for the purchase of property and a fleet of vehicles for the Permanent Mission's use, as well as various categories of unpaid expenses and benefits due to Mission Employees, including medical expenses, travel expenses, housing allowances, health insurance, relocation expenses, and education allowances. The amounts due to Mission Employees was approximately $4 million.

The unpaid expenses and benefits continued to mount during 2015. In a further effort to obtain reimbursement from the Government in Kinshasa, on July 1, 2015 Ambassador Gata wrote

a letter to the Prime Minister regarding "Pressing problems faced by the diplomats of the Permanent Mission of the Democratic Republic of Congo to the United Nations." Gata Declaration, Exhibit 5. The letter catalogues the significant amounts overdue for Permanent Mission expenses for rent, purchase of buildings and vehicles. It also outlines specific unpaid and overdue amounts owed to Mission Employees for expenses and benefits, including:

- **Education Allowance for Children of Diplomats.** Noting that "[c]ollege and university education is very expensive in the United States (**40 – 60 thousand dollars per year)**" and that "[i]n accordance with the regulations, the Government bears the cost of education for the children of diplomats", Ambassador Gata requested $215,000 for educational payments for his children and those of Paul Empole and another individual named Mukongo. He stated that "[t]his is an urgent situation that needs to be resolved in order not to sacrifice the future of these children."

- **Mandatory health insurance and debt repayment to local hospitals.** Ambassador Gata noted that "[d]iplomats and their families continue to be at risk because they are not covered by health insurance." He requested $30,000 per month to be allotted for health insurance coverage.

- **Payment of security deposit to newly appointed diplomats.** Noting the "very high cost of rent in New York City", Ambassador Gata requested $60,000 for security deposits and advance rent and real estate fees for Victoria Liolocha Lieta and Hyppolite Mfulu Kingonzila. He further noted that due to the non-payment of rent allowances, he was ordered by his landlord to vacate his apartment, and was

required to pay a $36,000 security deposit on his new residence which had not yet been paid.

- **Payment of Travel Debt.** The letter requested payment of $63,599.89 for repayment of debt incurred as a result of official travel, as well as travel expenses of $92,366.59 for expenses for service missions.

- **Arrears of allowances payable to diplomats.** Ambassador Gata pointed out that the Government had failed to make payment of monthly allowances of $90,000 for diplomats and lobbying costs and $40,000 for FSR (secret research expenses), then in arrears to Ambassador Gata in the amount of $615,500 and to Paul Empole in the amount of $580,649.

The July 1, 2015 letter specifically noted that Therese Y. Bianza Mpinga was owed $564,285.23 in unpaid salary, Marie Huguette Ngung was owed $115,000 in unpaid salary; Ignace Gata Mavita was owed $615,500 in allowances (bonuses and attendance fees); and Paul Losoko Efambe Empole was owed $580,649 in allowances.

These amounts remained outstanding, and indeed increased as a result of continued non-payment. Beginning in 2015, the United Nations made substantial payments to the Permanent Mission as reimbursement to the DRC for peacekeeping forces maintained by the DRC in the Central African Republic. It was agreed between the Permanent Mission and the DRC that these funds would be used, in part, to make partial payments to Mission Employees for the outstanding amounts due to them. Gata Declaration, ¶ 22.

On July 28, 2017, Ambassador Gata sent a message to the Minister of Foreign Affairs and International Cooperation ("Foreign Ministry") in Kinshasa. Gata Declaration, Exhibit 20. In this message, he confirmed that "in accordance with instructions received from his excellency the

President of the Republic … the Permanent Mission of the Democratic Republic of the Congo to the United Nations has proceeded with the payment of early retirement benefits and other bonuses and benefits due to the diplomats and administrative personnel concerned, according to their individual merits." Although Ambassador Gata referred to these payments in shorthand as "pension funds" in the request for transfers made to the UNFCU, Grossman Declaration, Exhibit 18, the contemporaneous documentary evidence clearly shows they were payments encompassing not only advance pensions payments but also "other bonuses and benefits due to" the individuals. On March 14, 2018, Ambassador Gata once again wrote to the Foreign Ministry to confirm that he had, as instructed, made "payment of supplementary advance compensations of retirement and other premiums and benefits owed to the diplomats and administrative personnel" at the Permanent Mission. Gata Declaration, Exhibit 21.

The amounts of the payments made to each employee was consistent with the amounts due to them. Over their years of employment, each accumulated unpaid benefits and allowances owed to them. Some were never paid their full salary. Mpinga Declaration, ¶ 4. With permission from the government, the Permanent Mission paid a portion of these owed amounts to the individuals, labeling the payments "pension funds," from the funds provided by the United Nations for the DRC's peacekeeping efforts. However, no employee was fully compensated for owed benefits and allowances. These amounts are summarized below.

| Individual | Total Amount Accumulated as of December 31, 2019 | Confirmed Payments of Benefits and Allowances as of December 31, 2019 | Amount Still Owed as of December 31, 2019 |
|---|---|---|---|
| Ignace R Gata Mavita Wa Lufuta | $3,476,098 | $1,660,000 | $1,816,098 |
| Paul Losoko Efambe Empole | $1,285,438.54 | $605,000 | $680,438.54 |

| Individual | Total Amount Accumulated as of December 31, 2019 | Confirmed Payments of Benefits and Allowances as of December 31, 2019 | Amount Still Owed as of December 31, 2019 |
|---|---|---|---|
| Victoria Lieta Liolocha | $660,286.40 | $425,000 | $235,286.40 |
| Bianza Therese Yvette Mpinga | $1,957,785.23 | $585,500 | $1,372,785.23 |
| Marie Huguette Ngung | $628,750 | $275,000 | $353,750 |
| Hyppolyte Kingonzila Mfulu | $530,000 | $375,000 | $155,000 |

As is clear from the above table, none of the Mission Employees received the full amount to which they were entitled. Indeed, many of the individuals to this day have not been paid their full entitlement, and additional pension payments remain due and owing. Gata Declaration, ¶ 27; Empole Declaration, ¶ 8; Liolocha Declaration, ¶ 5; Mpinga Declaration, ¶ 5; Ngung Declaration, ¶ 5; Mfulu Declaration, ¶ 5.

Aside from the payments made towards their benefits and allowances, the individuals also received other payments from the Permanent Mission. For example, they are each provided housing allowances under Item 43 of the Act of 1981 (Gata Declaration, Exhibit 2) and Section 56 of the 2016 Addendum (Gata Declaration, Exhibit 3). Thus each individual would occasionally be paid a lump sum to cover several months of rent. Gata Declaration, ¶ 29; Empole Declaration, ¶ 10; Liolocha Declaration, ¶ 7; Mpinga Declaration, ¶ 7; Ngung Declaration, ¶ 7; Mfulu Declaration, ¶ 7.

The transfers to Ambassador Gata's account for the purchase of a house were also completely appropriate and consistent with DRC law. On April 3, 2017, the Permanent Mission wired Ambassador Gata $100,000 for a down payment on a house. This was done pursuant to Item

47 of the Act of 1981, which provides that "an advance on processing and/or credit may be allocated to the agent in the course of a career for the purchase of movable property or immovable property, the terms and conditions of which are determined by regulation of administration." Gata Declaration, Exhibit 2. Consistent with this law, Ambassador Gata requested such an advance in order to pay for the purchase of the property in Pennsylvania. Gata Declaration, Exhibit 8. He made this request to the Foreign Ministry and it was granted. Gata Declaration, Exhibit 9. Therefore the funds were appropriately transferred to his personal account and used to purchase a home.

The Permanent Mission also wrote Ambassador Gata three checks for $50,000 each for lobbying expenses on July 24 and 31, 2017. These, too, were wholly appropriate and consistent with DRC law. The funds were transferred to Ambassador Gata consistent with Article 23 of Circular IV (Gata Declaration, Exhibit 4), which provides compensation to representatives of the DRC for "reception, reciprocity or prestige expenses" – essentially, lobbying. Gata Declaration, ¶ 24. The government provided Ambassador Gata with these funds in order to raise the profile and prestige of the DRC during a very tense time for the country leading up to its December 2018 elections. *Id*. Clearly these funds were provided for a diplomatic purpose.

Contrary to the unfounded allegations in the Grossman Declaration, all of the transfers made to the individuals' accounts were appropriate and in accordance with the law of the DRC. Each of the transfers was made for a diplomatic purpose, i.e. payments owed to the employees and diplomats under the law. None of the transfers represents a misappropriation of government funds. Therefore, none of the funds in those accounts can be considered DRC assets to be executed for the purpose of satisfying a debt of the DRC. These are private assets of individuals, not misappropriated public funds used for commercial purposes.

### B. Staff Member Accounts Are Also Immune from Execution under the Vienna Convention

"Diplomatic immunity in the United States is governed by the Vienna Convention on Diplomatic Relations" of 1961 (the "Vienna Convention"). *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 441 (2d. Cir. 2019). Article 31(1) of the Vienna Convention provides that a "diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State. He shall also enjoy immunity from its civil and administrative jurisdiction, except in the case of: …(c) [a]n action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions." Article 31(3) of the Vienna Convention states that "[n]o measure of execution may be taken in respect of a diplomatic agent" unless it relates to a commercial activity.

Plaintiff claims that the funds in these accounts were misappropriated and so the commercial activity exception is triggered, allowing execution against the funds in the accounts. However, as established above, all the payments made by the Permanent Mission into the personal accounts of the 6 individuals were legitimate, appropriate, and consistent with DRC law.

Since these payments are legitimate, they are also purely diplomatic in purpose. None of the payments were "outside [the individuals'] official functions." Vienna Convention, Art. 31(1)(c). In fact, just the opposite – all of the payments were received because the individuals were performing their official diplomatic functions and being compensated for it. Therefore, the commercial exception to diplomatic immunity does not apply and the individuals' assets must be protected from execution, consistent with international law.

This is true even for the former employees of the Permanent Mission. Under the Vienna Convention, the "function of a diplomatic agent comes to an end … (a) on notification by the sending State to the receiving State that the function of the diplomatic agent has come to an end."

Article 43. The Vienna Convention further states that when "the function of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so … However, with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist." Article 39(2). Similarly, the Second Circuit acknowledges a kind of 'residual immunity' which "remains with the former diplomats for certain acts committed during their occupation of the diplomatic station. Specifically, once a diplomat becomes a 'former' diplomat, he or she is not immune from suit for prior acts unless those acts were performed 'in the exercise of [the former diplomat's] functions as a member of the mission.'" *Swarna v. Al-Awadi*, 622 F.3d 123, 134 (2d. Cir. 2010). Acts that "are directly imputable to the state or inextricably tied to a diplomat's professional activities" retain residual immunity. *Id*. at 135. Acts related to a former diplomat's "management of the office in which the plaintiffs worked" constitute official acts and are protected by residual diplomatic immunity. *Brzak v. United Nations*, 597 F.3d 107, 113 (2d Cir. 2010).

Ambassador Gata is no longer the active Ambassador leading the Permanent Mission. The Permanent Mission notified the UN in December 2019 that he would be stepping down from his post. Ms. Ngung is also no longer an employee of the Permanent Mission. However, they retain immunity for acts performed while they were diplomatic agents. Because this dispute relates to the payments they received as employees and diplomats of the Permanent Mission, they retain their diplomatic immunity for these acts.

### C.     The Individual Accounts Are Also Immune from Execution under the FSIA

The Foreign Sovereign Immunities Act ("FSIA") makes foreign states immune from the jurisdiction of both federal and state courts. *Samantar v. Yousuf*, 560 U.S. 305, 309 (2010). Under the FSIA, "assets used exclusively to support diplomatic or consular functions are not considered

assets used for a 'commercial activity'" and therefore cannot be attached. *Thai Lao Lignite (Thailand) Co. v. Gov't of the Lao People's Democratic Republic*, No. 10 CIV. 5256 KMW, 2011 WL 4111504, at *3 (S.D.N.Y. Sept. 13, 2011). "[W]hen a plaintiff names only a foreign official, it may be the case that the foreign state itself … is a required party, because that party has 'an interest relating to the subject of the action' and 'disposing of the action in the person's absence may ... as a practical matter impair or impede the person's ability to protect the interest.'" *Samantar*, 560 U.S. at 324 (citing FRCP 19(a)(1)(B)). In such a situation, if the state is immune from suit under the FSIA, the entire matter must be dismissed because the case presents the "potential for injury to the interests of the absent sovereign." *Id.* at 324-25 (citing *Republic of Philippines v. Pimentel*, 553 U.S. 851, 867 (2008)).

Here, Plaintiff is attempting to attach the assets of the DRC in an effort to satisfy an outstanding judgment against the sovereign. It argues – and Defendant disputes – that the assets of the DRC are located in these individual officials' personal accounts. Thus the actual party in interest here is the DRC. Because the diplomatic property of the DRC cannot be attached, and because the DRC is the true party in interest, the individual accounts of the Permanent Mission employees also may not be attached under the FSIA.

**D.     Even if the Funds in the Personal Accounts Belonged to the DRC, Execution Against Third Parties Cannot Be Sought Ex Parte under CPLR 5225(b)**

Plaintiff seeks to execute against the individual bank accounts as property not in the possession of the judgment debtor under CPLR 5225(b) in order to satisfy its judgment against the DRC, the judgement-debtor. However, it sought such an order on an *ex parte* basis, in violation of applicable New York law.

A CPLR 5225(b) proceeding seeks to establish that "the judgment debtor is entitled to the possession of such property [transferred to a third party] or that the judgment creditor's rights to

the property are superior to those of the transferee." However, CPLR 5225(b) requires that "[n]otice of the proceeding … be served upon the judgment debtor." Moreover, New York courts have held that "CPLR 5225(b) which governs the payment or delivery to a judgment creditor of money or property belonging to the judgment debtor in the hands of a third person, or a "garnishee" …require[s] a special proceeding to be commenced by a judgment creditor against *the garnishee who must be served in the same manner as a summons in an action* (CPLR 403(c))." *Ruvolo v. Long Island R. R. Co.*, 45 Misc. 2d 136, 145 (N.Y. Sup. Ct. 1965) (emphasis added). It is appropriate to dismiss a proceeding brought by a judgment creditor to require the turnover of all funds of a judgment debtor where the judgment debtor was not properly notified of the proceeding because due process requires giving "the judgment debtor notice of the proceeding and an opportunity to intervene." *Bergdorf Goodman, Inc. v. Marine Midland Bank*, 97 Misc. 2d 311, 312-13 (N.Y. Civ. Ct. 1978).

Here, Plaintiff filed the present application *ex parte*, without notifying either the DRC as judgment-debtor or the Permanent Mission or individuals as garnishees. This failure to notify violates CPLR 5225(b). The DRC, the Permanent Mission and the individuals had a due process right to challenge the proceedings. They were denied this opportunity by Plaintiff's inappropriate ex parte application. Therefore, the Order should be modified and all the accounts should be released.

## III. THE ACCOUNTS OF THE PERMANENT MISSION ARE NOT SUBJECT TO EXECUTION TO SATISFY THE OBLIGATIONS OF THE DRC

### A. The Permanent Mission Accounts Are Immune from Execution under the Vienna Convention

The bank accounts of the Permanent Mission are protected by diplomatic immunity under the Vienna Convention and cannot be subjected to execution in order to satisfy a judgment against the DRC.

The Vienna Convention provides broad immunity for the premises, property and activities of Permanent Missions to the UN. Article 22(3) of the Vienna Convention provides that the "premises of the mission, their furnishings and other property thereon and the means of transport of the mission shall be immune from search, requisition, attachment or execution." This protection specifically applies to permanent missions to the UN. *See, 767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United Nations*, 988 F.2d 295, 298-99 (2d Cir. 1993) (determining that the Vienna Convention establishes the inviolability of permanent missions to the UN). Article 25 of the Vienna Convention requires that the United States "accord full facilities for the performance of the functions of the mission."

The courts have specifically held that "[b]ank accounts used by the mission for diplomatic purposes are immune from execution under [Article 25] as facilities necessary for the mission to function. *Avelar v. J. Cotoia Const. Inc.,* No. 11-CV-2172 RRM MDG, 2011 WL 5245206, at * 4 (E.D.N.Y. Nov. 2, 2011), *citing Sales v. Republic of Uganda*, No. 90-cv-3972, 1993 WL 437772, at *1 (S.D.N.Y. 1993)("It is well settled that a foreign state's bank account cannot be attached if the funds are used for diplomatic purposes."). *See also Foxworth v. Permanent Mission of Uganda*, 796 F. Supp. 761 (S.D.N.Y.1992); *Liberian E. Timber Corp. v. The Gov't of the Republic of Liberia*, 659 F. Supp. 606 (D.D.C.1987) (same).

Moreover, a sworn statement from the head of mission is sufficient to establish that a bank account is used for diplomatic purposes. *See Sales*, 1993 WL 437762, at *2 (noting also that, to remain consistent with principles of sovereign immunity, reliance on the mission head's affidavit is necessary to avoid "painstaking examination of the Mission's budget and books of account").

Plaintiff argues that because funds in the accounts of the Permanent Mission may have been misappropriated when they reached the DRC, that means the accounts of the Permanent

Mission where the UN funds passed through, were used for commercial purposes and are therefore attachable because they no longer retain diplomatic immunity under the Vienna Convention. However, Plaintiff fails to present a single piece of evidence of misappropriation by the Permanent Mission, any of its employees or diplomats, or Ambassador Gata and instead rely exclusively on inferences and conjecture.

The evidence shows, in fact, that the Permanent Mission accounts have been used exclusively for diplomatic purposes. The UN first deposited funds in the Permanent Mission accounts for peacekeeping on or about March 4, 2015. It is customary for the UN to pay countries for peacekeeping troops by depositing the relevant funds in that country's permanent mission to the UN. Gata Declaration, ¶ 16. The countries receiving these funds can decide how to use them with complete sovereignty. *Id*. The DRC decided to use a portion of those funds to pay the pensions and other benefits owed to its employees and diplomats under DRC law. The remainder of the funds were wired to the DRC to be deposited in the Central Bank.

Ambassador Gata never participated in any misappropriation of UN funds. Every wire transfer of funds he directed or oversaw was made for diplomatic purposes. Once the UN began consistently depositing funds in the Permanent Mission's account, Ambassador Gata requested permission from the government to use a portion of those funds to pay employees and diplomats the salaries, bonuses, benefits and pensions they were owed. Gata Declaration, ¶ 22. On July 28, 2017, Ambassador Gata wrote to the Minister of Foreign Affairs and International Cooperation to inform him that "in accordance with instructions received from His Excellency the President of the Republic regarding the expenses paid for the equipment and materials used by the Congolese contingent took part in the MINUSCA operations in the Central African Republic, the Permanent Mission of the Democratic Republic of the Congo to the United Nations has proceeded with the

payment of early retirement benefits and other bonuses and benefits due to the diplomats and administrative personnel concerned, according to their individual merits." Gata Declaration, Exhibit 20. That same day, Ambassador Gata instructed the UNFCU to proceed with payments to the individual accounts, identifying them in short hand as "Pension Funds." Grossman Declaration, Exhibit 18. Within a few months, by September 12, 2017, the Permanent Mission made its first payments to these individuals. These payments were in accordance with the law of the DRC, wholly appropriate, and a key part of the Permanent Mission's diplomatic function. Therefore, the Permanent Mission accounts were not used for commercial purposes, but only diplomatic ones, in paying money to the individual accounts.

Further, the transfers from the Permanent Mission accounts to the DRC were also completely appropriate and in line with DRC law. Ambassador Gata directed the Permanent Mission to wire UN funds to the DRC Central Bank on two occasions.

(a)     On October 28, 2015, Ambassador Gata informed the Minister of Foreign Affairs and International Cooperation that the Permanent Mission had transferred $13,391,928 "to Raw Bank/Kinshasa in accordance with the instructions provided to it by the Governor of the Central Bank of the Congo." Gata Declaration, Exhibit 6. The Wire Transfer Instruction Form attached to this message clearly shows that the beneficiary of these funds was "Banque Central du Congo" – the Central Bank of the DRC. *Id*.

(b)     On April 29, 2016, Ambassador Gata informed the Minister of Foreign Affairs and International Cooperation that the Permanent Mission had transferred $6,809,899 "to BGFI Bank/DRCongo in accordance with the instructions provided to it by the Governor of the Central Bank of the Congo," Gata Declaration, Exhibit 7. The Wire

Transfer Instruction Form attached to this message clearly shows that the beneficiary of these funds was "Banque Central du Congo" – the Central Bank of the DRC. *Id*.

In both cases, Ambassador Gata was following directions given to him by the government of the DRC, through the Governor of the Central Bank. Gata Declaration, ¶¶ 18-21 and Exhibits 6 and 7. Both of these payments were made for government purposes – the transfer of government funds from one government account (the Permanent Mission accounts) to another (Central Bank of the Congo). Gata Declaration, ¶ 21. Even if corrupt politicians later embezzled funds from the government, that does not transform the Permanent Mission accounts into commercial bank accounts. There is no evidence whatsoever that Ambassador Gata intended, or had any knowledge, that any funds were going to be misappropriated. Therefore, the Permanent Mission accounts have been used exclusively for diplomatic and government purposes. As such, the Permanent Mission accounts are immune from execution under the Vienna Convention.

## IV. DIPLOMATIC PERSONNEL CANNOT BE REQUIRED TO PROVIDE DISCOVERY IN A U.S. LEGAL PROCEEDING

In addition to the execution orders discussed above, Plaintiff seeks documents and testimony from former Ambassador Gata[1] seeking documents and testimony concerning his role as Ambassador. Discovery of an Ambassador to the United Nations is prohibited by the Vienna Convention, and the subpoena must be quashed.

The Vienna Convention states that a "diplomatic agent is not obliged to give evidence as a witness." Article 31(2). Thus an individual employed by the Permanent Mission, as a diplomatic

---

[1] In addition to Ambassador Gata, Plaintiff served subpoenas on the Permanent Mission, Paul Losoko Efambe Empole, Victoria Lieta Liolocha, Hippolyte Kingonzila Mfulu, Bianza Therese Yvette Mpinga, and Marie Huguette Nkus Ngung. Plaintiff has withdrawn without prejudice each of the subpoenas except for the subpoena served on Ambassador Gata.

agent of the DRC, cannot be compelled to provide testimony or evidence. Further, as previously explained, former diplomatic agents retain residual immunity for acts performed in the exercise of the former diplomatic function. *Swarna*, 622 F.3d at 134.

Specifically, Article 39(2) of the Vienna Convention states:

> When the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so, but shall subsist until that time, even in case of armed conflict. *However, with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist.*

Thus, Ambassador Gata, who previously served as the Permanent Representative at the Permanent Mission, cannot be compelled to provide evidence that relates to his former diplomatic function. Since the only subjects of his proposed testimony relate to his activities as the Ambassador to the United Nations, he cannot be compelled to give testimony in this case.[2]

The immunity afforded to diplomats from having to give evidence furthers the policy of the United States to avoid interference by host countries in the diplomatic mission of sister countries and to promote international diplomacy. The courts have repeatedly held that engaging in a "painstaking examination of the Mission's budget and books of account. . . cannot be reconciled with the principle of sovereign immunity." *Sales*, 1993 WL 437762, at *2.

In order to protect the important interests of diplomatic immunity, therefore, the courts have determined that a simple declaration by the head of a diplomatic mission is sufficient to establish that the accounts of that mission are used solely for diplomatic purposes. *Id*. Here, Ambassador Gata, who was the head of the Permanent Mission at all relevant time periods, has

---

[2] Notwithstanding their diplomatic immunity, because the plaintiff has made unfounded and highly damaging statements about the actions of the Mission Employees, they have submitted declarations concerning their actions. By doing so, the Mission Employees do not waive, and expressly reserve, their immunity from process.

declared that the accounts of the Permanent Mission were only ever used for diplomatic purposes. Gata Declaration, ¶ 4. In fact, he has gone further than that and offered testimony and evidence that all relevant transfers made by the Permanent Mission which Plaintiff claims were suspect were in fact wholly appropriate and made in compliance with DRC law. Ambassador Gata cannot be required to give evidence inconsistent with established principles of diplomatic immunity.

## V.     CONCLUSION

The declarations submitted herewith firmly establish that all payments transferred from the Permanent Mission's accounts to the accounts of its diplomats and employees and to the Central Bank were legitimate, appropriate, and legal and that the Permanent Mission accounts have been used solely for diplomatic purposes.  It is thus immune from execution.  Similarly, the Mission Employees have shown that their personal accounts were never used to misappropriate government funds and were only ever used to receive payments, pensions, and other benefits legally due to them. Therefore, their personal accounts do not contain government funds and may not be used to satisfy a judgment against the DRC.

Accordingly, Defendant respectfully requests that this Court modify its September 14 Order by vacating the Order to the extent that it applies to the accounts of the Permanent Mission and those of the Mission Employees, and vacate the order requiring expedited discovery of former Ambassador Gata.

Dated: November 15 , 2021
       New York, New York

Respectfully submitted,

By: _____
    Dennis H. Tracey, III
    Hogan Lovells US LLP
    390 Madison Avenue
    New York, NY 10017
    Telephone: (212) 918-300
    Fax: (212) 918-3100
    dennis.tracey@hoganlovells.com

    *Attorneys for Defendants-Judgment-Debtors*