UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FG HEMISPHERE ASSOCIATES, LLC, | 19-mc-00232-JPO |
| Plaintiff-Judgment-Creditor, | |
| v. | **DECLARATION OF PETER GROSSMAN** |
| DEMOCRATIC REPUBLIC OF CONGO, *et ano*., | |
| Defendants-Judgment-Debtors. | |

**PETER GROSSMAN** being duly sworn and deposed says:

1.      I am the Managing Director of plaintiff FG Hemisphere Associates, LLC ("Plaintiff").  As such, I am familiar with the facts and circumstances underlying this dispute and respectfully submit this declaration in support of Plaintiff's opposition to the Democratic Republic of Congo's ("DRC") motion to modify this Court's September 14, 2021 Order.

2.      The information contained herein is based upon my personal knowledge, upon documents kept in the regular course of business by Plaintiff or upon documents exhibited to the Declarations of Ignace Gata Mavita wa Lufuta ("Gata"), Paul Losoko Efambe Empole ("Empole"), Victoria Lieta Liolocha ("Liolocha"), Hippolyte Kingonzila Mfulu ("Mfulu"), Bianza Therese Yvette Mpinga ("Mpinga") and Marie Huguette Nkus Ngung ("Ngung") (collectively, the declarations are "DRC Declarations" and the individuals, collectively, the "Third-Party Garnishees").

3.      As previously discussed in the Declaration of Peter Grossman, dated August 10, 2021 (hereinafter "ECF No. 6"), Plaintiff has been litigating against the DRC for the better part of two decades, and this litigation has often been characterized by material omissions and misrepresentations made by the DRC's representatives in sworn statements.  ECF No. 6, ¶ 3. Unfortunately, this conduct appears to repeat itself in the DRC Declarations.  Indeed, it is the *modus operandi* of the DRC to create false paper trails to disguise illegitimate transactions and

1

create a veneer of legitimacy.  Non-existent debts are created to justify the movement of funds through the international financial system.  Multi-million dollar transfers are cloaked and papered as legitimate payments for fictitious goods and services.  Bribes, disguised as "retainer" payments and "success" fees for legal counsel inserted into the process by the DRC, are proposed as a pre-condition to Plaintiff's settlement.  Another such example is the Gecamines Tax Advance scheme, wherein the DRC diverted hundreds of millions of dollars of government funds when Gecamines, an insolvent state-owned company which had no foreseeable tax obligations, secretly paid many millions in "tax advances" to the DRC Central Bank, which were never reported in contemporaneous DRC Central Bank accounting and have effectively vanished.  ECF No. 6, ¶¶ 54-56.

4.  In sum, when the exhibits to the DRC Declarations are properly examined—in conjunction with the bank records submitted as exhibits to ECF No. 6 and additional information that has recently come to light concerning embezzlement centered around Kabila and BGFI DRC (as defined in ECF No. 6, ¶ 23) – they have no impact on Plaintiff's analysis of the embezzlement of the reimbursement funds owed by the United Nations to the DRC (the "UN Reimbursement Funds") by the family and associates of then-President Joseph Kabila ("Kabila") and the Third-Party Garnishees.  At the very worst, there are a set of highly specious factual defenses that the DRC, which has no immunity from testimony or discovery, must demonstrate outweigh Plaintiff's evidence to the contrary and otherwise support factual contentions that often are nonsensical.

5.  Plaintiff's investigation and allegations have recently been corroborated and expanded upon by an unprecedented leak of 3.5 million documents from BGFI DRC covering nearly a decade of transactions.  As detailed in ECF No. 6, BGFI DRC—where Mr. Gata wired the majority of the Second Tranche (as defined and discussed in ECF No. 6, ¶¶ 18, 21) of UN Reimbursement Funds—was used by the corrupt government as the conduit for the embezzled DRC funds and was where former President Kabila and his co-conspirators carried out the "Congo

Hold-up," as the reporting on this data leak is known.

6.      This reporting began on November 19, 2021 and is still continuing.  Much of the earliest reporting from this consortium (the "Congo Hold-up Consortium") focused on $85 million that Sud Oil (as defined and discussed in ECF No. 6, ¶ 25) had surreptitiously received from the DRC, including the $6.8 million embezzled from the Second Tranche of UN Reimbursement Funds.  Attached hereto as **Exhibit 1** is *Embezzled Empire: How Kabila's Brother Stashed Millions in Overseas Properties, THE SENTRY*, Nov. 2021.  The Congo Hold-up Consortium has identified a $138m of DRC government funds siphoned off through BGFI DRC, primarily via Sud Oil, for the benefit of Kabila's family and closest associates.  Attached hereto as **Exhibit 2** is *Exposed—the cost of Kabila's state capture, AFRICA CONFIDENTIAL*, 19 Nov. 2021.  The leaked records show that the DRC Central Bank itself sent $94.5 million to the BGFI DRC accounts of entities connected to the Kabila family, including Sud Oil.  Attached hereto as **Exhibit 3** is a true and correct copy *of Biggest African Bank Leak Shows Kabila Allies Looted Congo Funds*, BLOOMBERG NEWS, 19 Nov. 2021.  This number is exclusive of bribes that were also paid to these entities.

7.      This declaration addresses the implausibility of some assertions made by Mr. Gata: namely, that 1) the DRC Mission bank accounts were only used for diplomatic purposes (Gata Decl., ¶ 4[1]), 2) all payments to the Third-Party Garnishees from the UN Reimbursement Funds were payments of legitimate compensation made in accordance with DRC law, and 3) the payment of "pension funds" and supplements thereto were not just "pensions" but really the payment of other legitimate arrears owed to the Third-Party Garnishees.

**The DRC Mission Accounts Were Used for Non-Diplomatic Purposes**

---

[1] Later in his Declaration, Mr. Gata claims he has no knowledge of what happened to funds he wired to the DRC Central Bank, but states these "payments were made for governmental and non-commercial purposes" despite the fact that at least one wire was fraudulent and the proceeds were misappropriated by Kabila's family and associates. (Gata Decl., ¶ 21).

8.     Mr. Gata's assertion that the DRC Mission Accounts were only used for diplomatic purposes is demonstrably false.[2]  Neither acting as an agent of the DRC treasury[3], nor engaging in embezzlement, is a diplomatic function.  Mr. Gata states that he believed the instructions to wire approximately $6.8 million from the Second Tranche to the DRC Central Bank were legitimate rather than a ruse to divert these funds to BGFI DRC (part-owned by then-President Kabila's sister and run by his brother), which bank then deposited the funds into an account (Sud Oil's) owned by Kabila's family and controlled by his associates.  ECF No. 6, ¶¶ 23-28.  Mr. Gata's opinion on what he believed the money was for is irrelevant.  Neither DRC nor the Third-Party Garnishees have denied that the embezzlement scheme occurred or that the DRC Mission Accounts were utilized by the DRC and Kabila as part of the DRC Embezzlement Enterprise (as defined and discussed in ECF No. 6, ¶¶ 4-9).  At the end of the day, the DRC Mission Accounts were used to divert at least[4] $6.8 million to the private benefit of the Kabila family, regardless of Mr. Gata's stated lack of knowledge.  The DRC has forfeited any diplomatic immunity of its DRC Mission Accounts by using them in execution of the DRC Embezzlement Enterprise.

**Distinction Between Routine and Extraordinary Payments**

9.  Plaintiff engaged substantial resources reviewing all records for DRC Mission Accounts spanning roughly a decade, and explicitly distinguished millions of dollars in routine, legitimate payments to <u>all</u> of the DRC Mission's diplomatic staff and employees (collectively, "DRC Mission Staff").  These routine payments included, *inter alia*, salaries, payments for living

---

[2] He later changes this to "payments were made for governmental and non-commercial purposes", which while distinct from "diplomatic purposes", is still not true. (Gata Decl., ¶¶ 4, 21).

[3] The DRC Central Bank, unlike the Federal Reserve, functions as the DRC's treasury.  The DRC Central Bank has numerous accounts held in its own name at banks in the DRC and abroad.  The DRC Central Bank routinely uses its accounts to make and receive international wire transfers.  As a practical matter, there is no reason the DRC Central Bank could not have received the UN Reimbursement Funds directly into its own accounts.  Rather, the DRC chose to co-opt the DRC Mission Accounts for this purpose.

[4] "At least", as substantial additional information has come to light regarding the DRC Central Bank's role in diverting $94.5 million dollars to Kabila-linked accounts at BGFI DRC.  A very large portion of these embezzled funds originated from the DRC Central Bank's accounts at Rawbank, which received the entirety of the First Tranche (as defined in ECF No. 6, ¶¶ 18, 20).

and medical expenses, and bonuses (the "Routine Payments"). The DRC Mission Accounts received funding by wire transfers from the DRC Central Bank to make these Routine Payments. Wires received from the DRC Central Bank by the DRC Mission Accounts totaled nearly $20 million over this roughly ten-year period. ECF No. 6, ¶15.

10.     However, following the receipt of the UN Reimbursement Funds by the DRC Mission Accounts, which were controlled by Mr. Gata, Mr. Gata began using the DRC Mission Accounts to make large, extraordinary (as in not routine) payments first to himself, then to the balance of the Third-Party Garnishees (the "Extraordinary Payments"). Unlike the Routine Payments, the Extraordinary Payments were only made to the Third-Party Garnishees, not all DRC Mission Staff. Additionally, the Extraordinary Payments either had no given purpose or ones never seen in thousands of other payments. Additionally, it is clear from Mr. Gata's own exhibits that Kabila personally approved the Extraordinary Payments. Regardless, Mr. Gata claims all of these Extraordinary Payments, which occurred between 2017 and 2019, were in accordance with DRC law and that such "payments were made as part of normal salary and benefits for diplomatic staff." Gata Decl., ¶¶ 28-29.

11.     When one crunches the numbers, however, Mr. Gata's claimed "normal salary and benefits" becomes equally extraordinary. For example, bank records for the DRC Mission accounts show that in respect of 2017 alone, Mr. Gata received nearly $1 million in both Routine and Extraordinary Payments. These payments are itemized in the table below. Yet, Mr. Gata further represents (in support of his claim that the "pension fund" payments actually offset an existing debt) that he was still owed by the DRC another "$463,887 in benefits and bonuses [that] were unpaid and accrued" for 2017 (Gata Decl., ¶ 26), meaning his total claimed compensation for 2017 approaches $1.5 million.

12.     Below is a summary of payments received by Mr. Gata in 2017 that are either related to his Routine Payments for 2017 (as identified by Plaintiff - some of which were received

in arrears in 2018) or are Extraordinary Payments claimed by Mr. Gata to be part of his "normal salary and benefits":

| Date | Amount | Check No | Reference (ECF No. 6 Exhibit) | Stated Purpose | Category |
|---|---|---|---|---|---|
| 1/11/17 | $10,000.00 | 5704 | Exhibit 16, 1910 | "suppl. Loyers" (supplemental rent) | Routine Payment |
| 1/11/17 | $10,000.00 | 5705 | Exhibit 16, 1912 | "suppl. Loyers" | Routine Payment |
| 1/23/17 | $6,000.00 | 5709 | Exhibit 16, 1930 | "Frais Med" (medical fees) | Routine Payment |
| 3/1/17 | $6,500.00 | 5721 | Exhibit 16, 1964 | salary 1/17 | Routine Payment |
| 3/16/17 | $6,500.00 | 5730 | Exhibit 16, 2004 | salary 2/17 | Routine Payment |
| 4/24/17 | $6,500.00 | 5754 | Exhibit 16, 2044 | salary 3/17 | Routine Payment |
| 5/16/17 | $6,500.00 | 5769 | Exhibit 16, 2078 | salary 4/17 | Routine Payment |
| 6/9/17 | $6,500.00 | 5787 | Exhibit 16, 2098 | salary 5/17 | Routine Payment |
| 7/7/17 | $100,000.00 | wire | Exhibit 14, 7 | no purpose given | Extraordinary Payment |
| 7/7/17 | $9,000.00 | 5874 | Exhibit 16, 2224 | reimbursement various fees | Routine Payment |
| 7/7/17 | $50,000.00 | 5841 | Exhibit 16, 2242 | loyers janv-nov? 2017 (1) | Routine Payment |
| 7/7/17 | $50,000.00 | 5842 | Exhibit 16, 2244 | loyers janv-nov? 2017 (2) | Routine Payment |
| 7/7/17 | $50,000.00 | 5843 | Exhibit 16, 2246 | loyers janv-nov? 2017 (3) | Routine Payment |
| 7/21/17 | $50,000.00 | 5876 | Exhibit 16, 2262 | "frais lobbie" (lobby fees) | Extraordinary Payment |
| 7/21/17 | $50,000.00 | 5877 | Exhibit 16, 2264 | "frais lobbie" | Extraordinary Payment |
| 7/21/17 | $50,000.00 | 5875 | Exhibit 16, 2270 | "frais lobbie" | Extraordinary Payment |
| 8/23/17 | $6,500.00 | 5896 | Exhibit 16, 2318 | salary 6/17 | Routine Payment |
| 9/26/17 | $6,500.00 | 5913 | Exhibit 16, 2342 | salary 7/17 | Routine Payment |
| 10/18/17 | $6,500.00 | 5932 | Exhibit 16, 2372 | salary 8/17 | Routine Payment |
| 10/18/17 | $15,000.00 | 5939 | Exhibit 16, 2382 | indemnity HRC | Routine Payment |
| 10/19/17 | $250,000.00 | wire | Exhibit 14, 8 | no purpose given | Extraordinary Payment |
| 11/21/17 | $5,000.00 | 5961 | Exhibit 16, 2442 | collation Thanks/ 17 | Routine Payment |
| 11/27/17 | $6,500.00 | 5972 | Exhibit 16, 2450 | salary 9/17 | Routine Payment |
| 12/22/17 | $6,500.00 | 5984 | Exhibit 16, 2474 | salary 10/17 | Routine Payment |
| 12/22/17 | $30,000.00 | 5994 | Exhibit 16, 2488 | avance loyers 17 (rent advance) | Routine Payment |
| 12/26/17 | $30,000.00 | 6013 | Exhibit 16, 2520 | avance loyers 17 | Routine Payment |
| 12/27/17 | $60,000.00 | wire | Exhibit 14, 9 | no purpose given | Extraordinary Payment |
| 1/9/18 | $6,500.00 | 6014 | Exhibit 16, 2538 | salary 11/17 | Routine Payment |
| 1/30/18 | $6,500.00 | 6029 | Exhibit 16, 2578 | salary 12/17 | Routine Payment |
| 6/13/18 | $50,000.00 | | Gata Exhibit 18 | rent 2017 | Routine Payment |
| TOTAL | $953,000.00 | | | | |
| Routine | $393,000.00 | | | | |
| Extraordinary | $560,000.00 | | | | |

13.     In respect of the $410,000 in wire transfers noted above, although Mr. Gata nearly always noted the purpose of the payment on the checks he wrote for Routine Payments, no purpose was given for these Extraordinary Payments, which were the first such wires Mr. Gata had sent himself despite holding his position since 2012.  There was also a complete lack of corresponding payments to any other DRC Mission Staff (unlike the Routine Payments).

14.     Mr. Gata further claims that the "*frais lobbie*" totaling $150,000 were "funds [] provided to me in accordance with Article 23 of Circular IV, which allows for 'representation allowance ... intended to cover hospitality, reciprocity or prestige expenses'. Exhibit 4."  Putting aside, for now, that Mr. Gata did not record paying himself a penny of lobbying fees until July 2017, on top of this $150,000, Mr. Gata is also claiming that another $100,000 of such "representation allowances" under Article 23 are still owed to him for 2017, forming part of the "$463,887 in benefits and bonuses [that] were unpaid and accrued."  This would bring the paid and unpaid "representation allowances" claimed by Mr. Gata for 2017 to $250,000, or over $20,000/month.  Gata Decl., ¶ 26, Gata Exhibit 15, 3.  However, Ms. Liolocha represented in a sworn statement made in May 2018 (and which was provided to the UNFCU) that Mr. Gata's net income—which included $6,500 monthly for "allowances for functions and representation" (approximately $1/3^{rd}$ of Mr. Gata's claimed representation allowances)—totaled $17,150/month or $205,800 annually.  ECF No. 6 Exhibit 28 at 4.  This is approximately $1/5^{th}$ of what Mr. Gata claims he was legitimately paid in 2017 ($1/7^{th}$ if you include the additional amounts he claims he was owed and not paid).  Of course, the above is a mere example of various contradictions contained in the DRC Declarations (which Plaintiff would hope to set forth in full in an evidentiary hearing).  More fundamentally, taking into account the quantum of the Routine Payments, Extraordinary Payments and claimed unpaid debts owed to Mr. Gata for 2017 alone, as well as the relatively straightforward historical operating budget of the DRC Mission, to accept Mr. Gata's

story as even *possible*, one must also accept that he is perhaps the most highly compensated diplomat in the world.  I do not.

**Pension Payments - the Core of the Purported Legitimacy - Were Not Permitted By the Law**

15.    Mr. Gata's contention that some of the Extraordinary Payments were for legitimately owed pensions under DRC law is simply not supported by the very DRC laws Mr. Gata cites in support of his claimed compensation.[5]  Specifically, Mr. Gata claims "additional payments for my <u>pension</u>, benefits, allowances and bonuses [were] owed to me by the Government" (emphasis supplied). (Gata Decl., ¶ 25).  He also attaches tables to his Declaration (Exhibits 10-17) purporting to establish a $3,476,098 debt owed to him by the DRC which accrued between 2012 and 2019, which he claims was offset by the "pension funds" and "supplements".[6] Gata Decl., ¶ 26.

16.    However, the DRC laws cited by Mr. Gata do not provide for early retirement benefits.  Rather, under these laws, pensions are only payable "from the day on which the persons concerned have definitively ceased their service" (*i.e.*, actually retired, not continue to be employed) (Gata Exhibit 2, 20), "are acquired per month" (*i.e.*, on a monthly basis once retired, <u>*not in a lump sum while still employed*</u>) and only when he or she "has completed a career of at least twenty-five years."  Gata Exhibit 3, p. 41.  Critically, and as addressed in ECF No. 6, ¶ 43, none of the Third-Party Garnishees retired.  Thus, no pension payments were owed and payable in any amount, let alone in lump sums totaling millions of dollars. Additionally, Mr. Gata has made clear representations to this Court that he is still a diplomat "awaiting his next assignment" and thus is not retired.

---

[5] The exact language used in the cable from Mr. Gata personally thanking Kabila for these funds further underscores that these "pension funds" were not accrued debts.  Mr. Gata calls them "early retirement benefits".  (Gata Exhibit 20, 2) In its Memorandum of Law, DRC calls them "advance pension payments".

[6] The term "pension" does not once appear in these tables of purported accrued and unpaid debt, despite his claim that it was owed to him by the DRC.

17.     The underlying documentation exhibited to the Gata Declaration refers to these "pension fund" payments as "early retirement benefits" (DRC's counsel uses "advance pension payments"). (Gata Exhibit 20, 2) Perhaps realizing there is no justification for the "advance pension payments" under the DRC laws he cites, Mr. Gata claims some of his use of the term "pensions" was actually shorthand for accrued arrears of "social benefits" owed to "diplomats and DRC Mission employees,"[7] meaning these "pension" payments were actually the payment of other non-pension arrears.  Gata Decl., ¶¶ 20-22.  The bank records supplied ECF No. 6, Exhibit 16, show that, as part of the Routine Payments, millions of dollars of arrears were separately paid to all (not select) DRC Mission Staff by Mr. Gata on numerous occasions and these were clearly identified as "*arriérés*" [8] (arrears in French).  Alternatively, payments made in arrears noted the past time period which the payments covered (*see, e.g.*, the entries for "*loyers*" (rent) checks from July 2017, which covered such payments back until January 2017, in the table included *supra* at ¶ 12. (Incidentally, we have considered all of these to be "Routine Payments.")  In his cable personally thanking Kabila for the Extraordinary Payments, however, Mr. Gata refers to these payments (now being conveniently re-categorized as the payment of existing arrears) as "*autres primes et avantages*" (other bonuses and benefits).  Gata Exhibit 20, 2.  Not once elsewhere, despite having literally entered such information on thousands of checks over the course of many years, does Mr. Gata ever use this terminology (i.e., "*autres primes et avantages*") to describe the payment of arrears being made to DRC Mission Staff.

---

[7] "In deciding the amounts to be paid for social benefits and bonuses owed to diplomats and Permanent Mission employees, I first considered the funds that the Permanent Mission had at its disposal. On the basis of the Permanent Mission's other financial obligations, taking into account unforeseen situations that could arise, I decided on the amount to be allocated to each person as social benefits, which were often referred to in short as 'pensions'…." Gata Decl., ¶ 32.

[8] Gata Exhibit 20, 5.  Mr. Gata wrote dozens of checks on the DRC Mission Accounts for such arrears, describing them as "*arriérés*" and never as "*autres primes et avantages*" (see, e.g., Grossman Exhibit 17, 1358, 1360, 1362, 1364, 1366, 1368, 1370, 1372, 1374, 1376, 1378, 1384, 1386, 1412, 1458; 2106-2188; Gata Exhibit 20, 4).

18.     Further, Mr. Gata makes no effort to explain why "advance pension payments" and "other bonuses and payments" were only made to the Third-Party Garnishees and not all DRC Mission Staff, let alone why higher-ranking and longer-serving diplomatic staff were denied such payments.[9] Specifically, Mr. Gata claims $1.7 million (out of $2.7 million[10]) of the claimed, unpaid allowances are due to Charlotte Omoy Malinga, who despite being the second-highest ranking diplomat, received no "pension funds" from Mr. Gata (ECF No. 6, ¶ 53), and to another diplomat who also did not receive any of the "pension" payments made from UN Reimbursement Funds. Mr. Gata Exhibit 5, 5, 14.  If these debts were legitimate and truly owed, how is it that Ms. Malenga, who had been at the DRC Mission longer than both Ms. Liolocha and Mr. Mfulu, received nothing, while these other, less senior employees received several hundred thousand dollars each?  ECF No. 6 at ¶ 53.

19.     This glaring omission is magnified when one reviews other documents Mr. Gata has supplied in an attempt to justify the purported debt owed to him and the other Third-Party Garnishees.  Mr. Gata claims that Exhibits 10-12 establish debts in excess of $1.2 million that were unpaid by the DRC and accrued to his benefit between 2012-2014.  This purported debt, as shown in the exhibits, encompasses a wide variety of unpaid allowances, housing and educational expenses, etc. Yet, in a letter to the DRC written in 2015 (i.e., postdating the purported accrual of the debts itemized in Exhibits 10-12), Mr. Gata claims he is owed $615,500 (Gata Exhibit 5, 5, 14)—and not for the items enumerated in Exhibits 10-12.  No mention is even made of the $1.2 million he now claims he was owed.

---

[9] "In accordance with the instructions of the Government, the Permanent Mission paid part of the arrears owed to the diplomats and assimilated staff who work there as well as to myself, according to the merits of each one and by virtue of the legal and regulatory texts, cited in paragraph 7 above, governing career development and other benefits granted to diplomatic personnel." Gata Decl., ¶ 22.

[10] The remaining $1 million or so is ostensibly owed to Mr. Gata and Mr. Empole.

20.     Attached hereto as **<u>Exhibit 4</u>**, is a true and correct copy of correspondence from Defendants' counsel confirming that Mr. Gata has applied for permanent residency.

21.     Attached hereto as **<u>Exhibit 5</u>** and **<u>Exhibit 6</u>** are true and correct copies of Ms. Mpinga and Ms. Ngung's Permanent Resident cards, supplied by Defendants' counsel.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  New York, New York
    December 2, 2021

Peter Grossman