**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FG HEMISPHERE ASSOCIATES, LLC,

        Plaintiff,

  v.

DEMOCRATIC REPUBLIC OF THE CONGO and     No. 19 MC 232 (JPO)
SOCIETE NATIONALE D'ELECTRICITE,

        Defendants.

---

UNITED STATES OF AMERICA,

        Interested Party.

# STATEMENT OF INTEREST OF
# <u>THE UNITED STATES OF AMERICA</u>

                                      DAMIAN WILLIAMS
                                      United States Attorney for the
                                      Southern District of New York
                                      86 Chambers Street, 3rd Floor
                                      New York, New York 10007
                                      Tel.: (212) 637-2761
                                      Fax: (212) 637-2786

CHRISTOPHER CONNOLLY
Assistant United States Attorney
    - Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ..........................................................................................................................1

ARGUMENT ................................................................................................................................4

I.      The Protections Under the VCDR Shield the DRC's Mission Bank Accounts Used for Diplomatic Purposes from Restraint ...........................................................................4

II.     The VCDR Protects the Bank Accounts of Accredited Diplomats from Restraint, and Principles of Reciprocity Weigh Against Allowing the Restraint of the Remaining Personal Accounts.............................................................................................................10

III.    The VCDR Protects Accredited Diplomats and the Information of a Foreign Diplomatic Mission from Discovery ..............................................................................12

CONCLUSION............................................................................................................................15

# TABLE OF AUTHORITIES

**CASES** **PAGE**

*767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to the United Nations*,
    988 F.2d 295 (2d Cir. 1993) ................................................................................. 4, 5, 8, 13

*Avelar v. J. Cotoia Const., Inc.*,
    11-CV-2172 (RMM)(MDG), 2011 WL 5245206 (E.D.N.Y. Nov. 2, 2011) ............. *passim*

*Birch Shipping Corp. v. Embassy of the United Republic of Tanzania*,
    507 F. Supp. 311 (D.D.C. 1980) ...................................................................................... 9

*Broidy Capital Mgmt. LLC v. Benomar*,
    944 F.3d 436 (2d Cir. 2019) ........................................................................................ 8, 12

*Devengoechea v. Bolivarian Republic of Venezuela*,
    No. 12-cv-23743, 2014 WL 12488572 (S.D. Fla. Oct. 28, 2014) ...................................... 6

*Foxworth v. Permanent Mission of the Republic of Uganda to the United Nations*,
    796 F. Supp. 761 (S.D.N.Y. 1992) ................................................................................ 6, 7

*Hill v. Republic of Iraq*,
    No. 99 Civ. 03346 (TP), 2003 WL 21057173 (D.D.C. Mar. 11, 2003) ............................ 9

*Liberian Eastern Timber Corp. v. Gov't of the Republic of Liberia*,
    659 F. Supp. 606 (D.D.C. 1987) ........................................................................... 6, 7, 9, 12

*NML Capital, Ltd. v. Republic of Argentina*,
    680 F.3d 254 (2d Cir. 2012) .............................................................................................. 9

*Sales v. Republic of Uganda*,
    90 Civ. 3972 (CSH), 1993 WL 437762 (S.D.N.Y. Oct. 23, 1993) ...................... 6, 7, 8, 10

*Swarna v. Al-Awadi*,
    622 F.3d 123 (2d Cir. 2010) ............................................................................................ 13

*Tabion v. Mufti*, 73 F.3d 535 (4th Cir. 1996) ...................................................................... 11

*Thai Lao Lignite (Thailand) Co. Ltd. v. Government of the Lao People's Democratic Republic*,
    924 F. Supp. 2d 508 (S.D.N.Y. 2013) .............................................................................. 8

*Weston Compagnie de Finance et D'Investissement, S.A. v. La Republica del Ecuador*,
    823 F. Supp. 1106 (S.D.N.Y. 1993) ................................................................................ 9

*Wyatt v. Syrian Arab Republic*,
    83 F. Supp. 3d 192 (D.D.C. 2015) .................................................................................. 6, 10

**STATUTES AND LEGISLATIVE HISTORY**

28 U.S.C. § 517 ..................................................................................................................... 1

28 U.S.C. § 1609 ................................................................................................................... 4

28 U.S.C. § 1610 ................................................................................................................... 4

H.R. Rep. No. 94-1487 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604 ................................ 4, 8

**INTERNATIONAL TREATIES**

Agreement Between the United Nations and the United States Regarding the Headquarters
    of the United Nations, June 26, 1947, T.I.A.S. 1676 .......................................................... 5

Convention on Privileges and Immunities of the United Nations ................................................... 5

Vienna Convention on Diplomatic Relations,
    Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. 7502 ......................................................... *passim*

**OTHER AUTHORITIES**

Eileen Denza, Diplomatic Law: Commentary on the Vienna Convention on
    Diplomatic Relations (3d ed. 2008) ..................................................................................... 13

**PRELIMINARY STATEMENT**

Pursuant to 28 U.S.C. § 517, the United States of America, by its attorney, Damian Williams, United States Attorney for the Southern District of New York, respectfully submits this statement of interest concerning the order entered by this Court permitting plaintiff FG Hemisphere Associates LLC to take certain actions to satisfy default judgments against defendant the Democratic Republic of the Congo ("DRC").

As set forth below, the Vienna Convention on Diplomatic Relations ("VCDR") precludes many of the actions authorized by the order, and the protections afforded by the VCDR are extended by international agreement to foreign diplomatic missions to the United Nations ("UN"). Specifically, the VCDR (i) precludes attachment or execution on bank accounts used by the DRC's UN Mission for diplomatic purposes; (ii) precludes attachment or execution on the personal bank accounts of accredited diplomats to the DRC's UN Mission; and (iii) shields the DRC's UN Mission, its archives and documents, and its accredited diplomats from discovery. The United States therefore respectfully requests that the Court modify its order accordingly.

**BACKGROUND**

This case concerns FG Hemisphere's efforts to enforce default judgments against the DRC in U.S. courts. In June 2003, FG Hemisphere petitioned the U.S. District Court for the District of Columbia for confirmation of an arbitral award granted by the International Court of Arbitration of the International Chamber of Commerce against the DRC and a DRC-owned entity. *See* Verified Petition for Confirmation of a Foreign Arbitral Award (ECF No. 1), *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, Nos. 1:03-cv-1314, 1:03-cv-1315 (D.D.C. June 17, 2003). In September 2004, the court granted FG Hemisphere's motion for default judgment and confirmation of the arbitral award in the amount of more than $11 million, plus interest.

Judgment & Order (ECF No. 17), *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, No. 1:03-cv-1314 (D.D.C. Sept. 20, 2004). In a companion case related to the same debt, the court granted FG Hemisphere's motion for default judgment and confirmation of the arbitral award in the amount of more than $18 million, plus interest. Judgment & Order (ECF No. 24), *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, No. 1:03-cv-1315 (D.D.C. Jan. 31, 2005). In 2015, the court entered an order reviving the judgments for a period of 12 years, as neither judgment had been satisfied. Order (ECF No. 85), *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, No. 1:03-cv-1315 (D.D.C. Dec. 21, 2015).

In May 2019, FG Hemisphere registered its judgments with this Court. ECF No. 1. On August 10, 2021, FG Hemisphere filed an *ex parte* application with the Court for an order: (i) authorizing FG Hemisphere "to deliver writs of execution to the United States Marshals Service . . . permitting execution on the Democratic Republic of Congo ('DRC') and its agents' property in the United States"; (ii) authorizing FG Hemisphere "to issue restraining notices on TD Bank and the United Nations Federal Credit Union ('UNFCU') accounts of the DRC and its sub-division, the Permanent Mission of the Democratic Republic of Congo ('DRC Mission')," as well as six current and former diplomats and staff members of the DRC Mission;[1] (iii) "directing TD Bank and the UNFCU, as garnishees . . . to turn over all assets of the DRC and its sub-division, the DRC Mission, held in accounts in the name of the DRC Mission or in the names of any of the [individuals]"; (iv) giving FG Hemisphere "priority over other creditors who may also seek to

---

[1] According to records of the U.S. Mission to the United Nations, three of the named individuals (Paul Losoko Efambe Empole, Victoria Lieta Liolocha, and Hippolyte Kingonzila Mfulu) are diplomats currently accredited to the DRC's UN Mission; one (Ignace R. Gata Mavita Wa Lufuta) is a diplomat previously accredited to the Mission; and two (Bianza Therese Yvette Mpinga and Marie Huguette Nkus Ngung) are local hires of the Mission, although Ngung has indicated in her declaration that her position terminated in October 2019.

attach or execute upon the same assets" that were the subject of *ex parte* application; and (v) requiring the DRC "and its agents" to "respond to expedited discovery." ECF No. 4-1. In support of its application, FG Hemisphere alleged "a sprawling enterprise through which millions of dollars in DRC assets were embezzled by senior DRC government officials and their coconspirators[,]" including "transfers of money and other assets in the U.S. effectuated through the DRC Mission." Mem. of Law in Support of Writ of Execution (ECF No. 7) at 2; *see id.* ("In essence, the DRC Mission's purported diplomatic purpose is simply a chimera that veils the improper actions of a kleptocracy acting with impunity in New York, and the DRC Mission.").

This Court granted the application and awarded the requested relief on September 14, 2021. ECF No. 8 ("Order"). In doing so, the Court found that "sufficient time has elapsed since the Judgments were entered to permit enforcement to commence, and that enforcement may proceed at this time consistent with the Foreign Sovereign Immunities Act ('FSIA'), 28 U.S.C. § 1602 et seq." Order at 2.

By letter dated September 22, 2021, the United States informed the Court that its Order "may raise issues that implicate the interests of the United States," and that the government was therefore "actively considering whether to file a Statement of Interest in this matter, as permitted by 28 U.S.C. § 517." ECF No. 11. By letter dated November 8, 2021, the United States informed the Court of its intention to "file a statement of interest advising the Court that the United States' treaty obligations: (1) preclude any attempt by plaintiff to attach or execute on a bank account used by [the DRC's UN] Mission for diplomatic purposes; (2) protect bank accounts of the DRC UN Mission's accredited diplomats; and (3) immunize a foreign mission and accredited diplomats from discovery." ECF No. 16.

The DRC appeared in this matter on October 21, 2021, ECF No. 13, and on November 15, 2021, it moved to modify the Court's Order, ECF Nos. 17-24. The DRC asserted that the VCDR precludes FG Hemisphere's attempts to execute against the DRC's UN Mission bank accounts and the personal bank accounts of individual diplomats and staff, and provides the individuals immunity from participating in discovery. ECF No. 18 ("DRC Br."). FG Hemisphere opposed the DRC's motion, ECF Nos. 30, 31, and the motion became fully briefed on December 9, 2021, ECF Nos. 32, 33.

## ARGUMENT

**I.       The Protections Under the VCDR Shield the DRC's UN Mission Bank Accounts Used for Diplomatic Purposes from Restraint**

The United States' treaty obligations preclude FG Hemisphere's attempt to execute on bank accounts used by the DRC's UN Mission for diplomatic purposes. In general, under the FSIA, the property of a foreign state may be subject to attachment or execution to satisfy a judgment if the property is both "in the United States" and "used for a commercial activity in the United States." 28 U.S.C. § 1610(a). But Congress enacted the FSIA "[s]ubject to existing international agreements to which the United States is a party," 28 U.S.C. § 1609, and the FSIA therefore does not circumscribe the broad protections and immunities conferred by the VCDR, *see* H.R. Rep. No. 94-1487, at 12 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6630 (the FSIA is "not intended to affect either diplomatic or consular immunity"). In other words, the FSIA's exceptions to immunity from attachment and execution are "inapplicab[le]" to an analysis of the validity of attachment where an international agreement such as the VCDR provides immunity. *767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to the United Nations*, 988 F.2d 295, 297 (2d Cir. 1993).

Article 25 of the VCDR shields the bank accounts of foreign diplomatic missions from attachment and execution. That article provides that "[t]he receiving State shall accord full facilities for the performance of the functions of the mission." VCDR, art. 25, Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. 7502. Accordingly, the standard for determining whether a diplomatic bank account is immune from attachment under the VCDR is not whether that account is used for commercial activities, but rather whether such immunity is necessary to ensure the "full facilities" to which the diplomatic mission of the sending state is entitled. VCDR, art. 25; *see also id.*, Preamble (privileges and immunities conveyed by the VCDR are meant "to ensure the efficient performance of the functions of diplomatic missions"). The protections afforded by the VCDR extend by international agreement to UN missions and therefore extend, and apply equally, to the DRC's UN Mission bank accounts. *See* Agreement Between the United Nations and the United States Regarding the Headquarters of the United Nations, art. V, § 15, June 26, 1947, T.I.A.S. 1676 (UN representatives entitled to the same privileges and immunities as the United States accords to diplomatic envoys); Convention on Privileges and Immunities of the United Nations, art. IV, § 11(g) (member state representatives to the UN receive the same privileges and immunities as diplomatic envoys) (collectively, the "UN Agreements"); *accord 767 Third Ave. Assocs.*, 988 F.2d at 298 (applying VCDR to define protection afforded to UN permanent mission).

Courts have routinely held that according "full facilities" to a diplomatic mission as required by Article 25 includes providing immunity from execution or attachment on embassy or mission bank accounts that are used for diplomatic purposes, because such bank accounts are critical to the functioning of a diplomatic mission. *See, e.g., Avelar v. J. Cotoia Const., Inc.*, 11-CV-2172 (RMM)(MDG), 2011 WL 5245206, at *4 (E.D.N.Y. Nov. 2, 2011) ("Bank accounts used for diplomatic purposes are immune from execution under [Article 25], as facilities necessary

for the mission to function."); *Sales v. Republic of Uganda*, 90 Civ. 3972 (CSH), 1993 WL 437762, at *1 (S.D.N.Y. Oct. 23, 1993) ("It is well settled that a foreign state's bank account cannot be attached if the funds are used for diplomatic purposes."); *Foxworth v. Permanent Mission of the Republic of Uganda to the United Nations*, 796 F. Supp. 761, 763 (S.D.N.Y. 1992) (the "attachment of [the Uganda UN Mission's] bank account is in violation of the United Nations Charter and the [VCDR] because it would force defendant to cease operations"); *see also Wyatt v. Syrian Arab Republic*, 83 F. Supp. 3d 192, 195-96 (D.D.C. 2015) ("To hold otherwise would put to foreign embassies the dilemma of either avoiding United States banks entirely or keeping money in this country subject to the threat of confiscation at any time. This would be contrary to the VCDR's stated purpose of ensuring the efficient performance of the functions of diplomatic missions." (quotation marks and alteration omitted)); *Devengoechea v. Bolivarian Republic of Venezuela*, No. 12-cv-23743, 2014 WL 12488572, at *5 (S.D. Fla. Oct. 28, 2014) ("In addressing the 'full facilities' language from the VCDR . . . , courts have found that bank accounts used by a mission for diplomatic purposes are immune, as they are necessary for the mission to function."), *report and recommendation adopted*, No. 12-cv-23743, 2014 WL 12488573 (S.D. Fla. Nov. 12, 2014); *Liberian Eastern Timber Corp. v. Gov't of the Republic of Liberia*, 659 F. Supp. 606, 608 (D.D.C. 1987) ("The Liberian Embassy lacks the 'full facilities' the Government of the United States has agreed to accord if, to satisfy a civil judgment, the Court permits a writ of attachment to seize official bank accounts used or intended to be used for purposes of the diplomatic mission.").

Moreover, in applying Article 25 in this context, courts have relied on sworn affidavits submitted by mission officials attesting that the bank accounts at issue were used for the functioning of the mission. *See, e.g.*, *Avelar*, 2011 WL 5245206, at *4 ("A sworn statement from

the head of mission is sufficient to establish that a bank account is used for diplomatic purposes.");
*Sales*, 1993 WL 437762, at *2 (reliance on mission head's affidavit, rather than "painstaking examination of the Mission's budget and books of account," is consistent with principle of diplomatic immunity); *Foxworth*, 796 F. Supp. at 762 (relying on declaration to describe nature and purpose of accounts); *Liberian Eastern Timber Corp.*, 659 F. Supp. at 610 (same).

Here, the Declaration of Paul Losoko Efambe Empole— the Mission's Chargé d'affaires and currently its highest-ranking diplomat—submitted by the DRC in support of its motion to amend the Order is sufficient to establish that the DRC's UN Mission accounts are protected from attachment and execution under Article 25. *See* Declaration of Paul Losoko Efambe Empole, dated Nov. 4, 2021 ("Empole Decl.") (ECF No. 20) ¶ 3. The Empole Declaration states that the accounts in question "have been used during [Empole's] tenure as Chargé d'affaires exclusively for the Permanent Mission's diplomatic purposes." *Id.* ¶ 4. It further states that because these accounts have been frozen pursuant to the Court's Order, "the Permanent Mission cannot perform its diplomatic function to represent the Democratic Republic of the Congo before the United Nations." *Id.* ¶ 5. Because the declaration attests to the diplomatic nature of the accounts at issue, Article 25 of the VCDR prohibits the accounts' restraint.[2]

FG Hemisphere's arguments to the contrary are unavailing. To begin, FG Hemisphere is wrong to suggest that attachment and execution on the Mission accounts is permissible under the FSIA, *see* ECF No. 31 ("Pl. Opp.") at 5, and that case law construing the FSIA's commercial

---

[2] As explained above, a sworn statement from the current head of mission alone is sufficient to establish that bank accounts are used for diplomatic purposes, and thus immune from attachment and execution under VCDR Article 25. *See, e.g.*, *Avelar*, 2011 WL 5245206, at *4. Here, the DRC has also submitted a declaration from the former head of its UN Mission, Ignace R. Gata Mavita Wa Lufuta, which attests that the accounts were used for diplomatic purposes. *See* Declaration of Ignace R. Gata Mavita Wa Lufuta, dated Nov. 10, 2021 (ECF No. 19) ¶¶ 3-4.

7

activity exception is relevant to assessing the scope of the VCDR's protections, *see id.* at 7. As explained above, the FSIA does not "affect either diplomatic or consular immunity," H.R. Rep. No. 94-1487, at 12, and its commercial activity exception is therefore "inapplicab[le] to an analysis of the validity of attachment" under the VCDR, *767 Third Ave. Assocs.*, 988 F.2d at 297. Indeed, the Second Circuit has explained that "[t]he FSIA, as a statute that was enacted after the VCDR and was not intended to affect diplomatic immunity under the VCDR, is generally inappropriate for use as an interpretive guide to the Vienna Convention." *Broidy Capital Mgmt. LLC v. Benomar*, 944 F.3d 436, 444 (2d Cir. 2019) (quotation marks omitted). Under the VCDR, the sole question is whether "the funds are used for diplomatic purposes"; if so, they "cannot be attached." *Sales*, 1993 WL 437762, at *1. And "[a] sworn statement from the head of mission is sufficient to establish that a bank account is used for diplomatic purposes." *Avelar*, 2011 WL 5245206, at *4.[3]

For similar reasons, FG Hemisphere's allegation that at least portions of the accounts have been used for "commercial activities," Pl. Opp. 10-11, is also misplaced.[4] The cases it cites for this proposition should not be followed here because they fail to address the international obligations applicable to the restraint of the bank account of a diplomatic mission, and are

---

[3] Accordingly, FG Hemisphere's reliance on *Thai Lao Lignite (Thailand) Co. Ltd. v. Government of the Lao People's Democratic Republic*, 924 F. Supp. 2d 508 (S.D.N.Y. 2013), is unavailing. As FG Hemisphere explains, the court in *Thai Lao* "rejected the argument that an account maintained by the UN Mission of Laos was facially immune from execution and discovery under the FSIA and the Vienna Convention and declined to give dispositive weight to an affidavit from a Laotian official that the account was used for diplomatic purposes." Pl. Opp. at 9. Yet those holdings were in error for the reasons explained herein and those set forth in the United States' amicus brief on appeal in that case. *See* Brief for the United States of America as Amicus Curiae in Support of Reversal (ECF No. 233) at 13-18, *Thai Lao Lignite (Thailand) Co. Ltd. v. Government of the Lao People's Democratic Republic*, No. 13-495 (2d Cir. May 17, 2013).

[4] The Empole Declaration asserts that the accounts "have not been used for any commercial activities." Empole Decl. ¶ 4.

otherwise inapposite because they addressed attachment and execution under either the FSIA's exceptions to execution immunity, *see Weston Compagnie de Finance et D'Investissement, S.A. v. La Republica del Ecuador*, 823 F. Supp. 1106, 1114 (S.D.N.Y. 1993) (finding that funds in a central bank account where the central bank "merely acts as an intermediary bank" were not property of a foreign central bank "held for its own account" under 28 U.S.C. § 1611(b)); *Birch Shipping Corp. v. Embassy of the United Republic of Tanzania*, 507 F. Supp. 311, 313 (D.D.C. 1980), or the Terrorism Risk Insurance Act ("TRIA"), *see Hill v. Republic of Iraq*, No. 99 Civ. 03346 (TP), 2003 WL 21057173, at *2 & n.4 (D.D.C. Mar. 11, 2003) (affording the President an opportunity to exercise the waiver authority under TRIA if the accounts in question were subject to the VCDR). In applying Article 25 of the VCDR, by contrast, courts have "decline[d] to order that if any portion of a bank account is used for a commercial activity then the entire account loses its immunity." *Liberian Eastern Timber Corp.*, 659 F. Supp. at 610; *see also NML Capital, Ltd. v. Republic of Argentina*, 680 F.3d 254, 259 (2d Cir. 2012) ("We do not consider, much less decide, the question of whether funds held by a foreign sovereign in a United States bank account for the exclusive or primary purpose of conducting consular or diplomatic functions would be subject to attachment under the FSIA. The attachment of such funds is subject to a different analysis under the FSIA and . . . the [VCDR].").

Finally, FG Hemisphere's allegations concerning the Mission accounts' use in a "scheme to embezzle DRC funds," Pl. Opp 8, are not dispositive. FG Hemisphere relies on those allegations in an effort to distinguish this matter from case law applying VCDR Article 25 to protect diplomatic bank accounts. *See id.* at 6, 8-9. But none of those cases relied on a plaintiffs' allegations regarding the use of funds in diplomatic accounts, let alone conducted an independent examination of the use of such funds to determine how they had been used. Rather, the courts in

9

those cases looked to whether the sending states asserted in sworn declarations that the funds in question were "used for diplomatic purposes," and thus "necessary for the mission to function." *Avelar*, 2011 WL 5245206, at *4. Where, as here, the sending state has submitted such a declaration, the United States' obligation under VCDR Article 25 to afford "full facilities" to diplomatic missions obliges courts to refrain from permitting restraint of diplomatic and consular accounts. To hold otherwise—in this case, to permit a "painstaking examination of the Mission's budget and books of account" in order to test the validity of FG Hemisphere's allegations—would be inconsistent with the principle of diplomatic immunity, *Sales*, 1993 WL 437762, at *2, and would force foreign missions to either "avoid[] United States banks entirely or keep[] money in this country subject to the threat of confiscation at any time," *Wyatt*, 83 F. Supp. 3d at 195-96. That outcome would interfere with the performance of the functions of Mission. *See* VCDR, art. 3. Moreover, U.S. diplomatic missions abroad would be at risk of reciprocal treatment.

**II.     The VCDR Protects the Bank Accounts of Accredited Diplomats from Restraint, and Principles of Reciprocity Weigh Against Allowing the Restraint of the Remaining Personal Accounts**

The United States' treaty obligations likewise protect the personal bank accounts of the three individuals listed in the Court's Order who are currently accredited diplomats assigned to the DRC's UN Mission: Empole, Victoria Lieta Liolocha, and Hippolyte Kingonzila Mfulu. That is because the VCDR provides that, subject to certain exceptions, the property of a diplomatic agent "shall enjoy . . . inviolability[,]" VCDR, art. 30(2), and "[n]o measures of execution may be taken in respect of a diplomatic agent[,]" *id.*, art. 31(3). Here again, the protections afforded by the

VCDR are extended by the UN Agreements to accredited diplomats of a foreign mission to the UN.[5]

No exception to immunity applies here. FG Hemisphere contends that neither VCDR Article 25 nor its related case law supports shielding the accounts of individual diplomats from restraint. *See* Pl. Opp. at 12-13. But that is irrelevant because the plain language of VCDR articles 30(2) and 31(3), which FG Hemisphere does not address, does shield individual diplomats and their property. Likewise, while FG Hemisphere is correct that the VCDR does not provide for immunity in "an action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions," VCDR, art. 31(1)(c); *see* Pl. Opp. at 13-14, FG Hemisphere has failed to explain the outside commercial activity in which these individuals are purported to have engaged that would make them liable for the debts of the DRC. It is unclear at best how FG Hemisphere's allegations concerning these individuals—that their bank accounts contain funds embezzled from the Mission bank accounts—could fall within that exception. *See, e.g.*, *Tabion v. Mufti*, 73 F.3d 535, 537 (4th Cir. 1996) ("commercial activity" under the VCDR is "the pursuit of trade or business activity").

Moreover, FG Hemisphere's allegations suggest that funds in the personal accounts properly belong to the DRC, not the individuals; but the DRC has not asserted an ownership interest in those funds. Rather, it has submitted declarations from all of these individuals attesting to the propriety of the payments they received. *See* ECF Nos. 19-24. And as explained above,

---

[5] Although the privileges and immunities afforded to diplomats terminate soon after the conclusion of a diplomat's assignment, a former diplomat retains limited residual immunity "with respect to acts performed . . . in the exercise of his functions as a member of the mission." VCDR, art. 39(2).

even under FG Hemisphere's theory, the FSIA's commercial activity exception still would not govern here. *See Broidy Capital Mgmt.*, 944 F.3d at 444.

Although the other three individuals subject to the Order—former Ambassador Gata and local hires Bianza Therese Yvette Mpinga and Marie Hugette Nkus Ngung—are not presently accredited diplomatic personnel and are therefore outside the scope of immunity provided by the VCDR, permitting restraint on their personal accounts would implicate serious reciprocity concerns. The United States would object strongly to any attempts by a foreign court to restrain the accounts of current or former U.S. diplomatic staff to satisfy a foreign court judgment against the United States, and allowing restraint on any of the personal accounts at issue in this case would undermine the United States' ability to vindicate its interests and those of its employees.

## III. The VCDR Protects Accredited Diplomats and the Information of a Foreign Diplomatic Mission from Discovery

The VCDR also bears on the expedited discovery provided for by the Order. Since the Order was issued, FG Hemisphere has withdrawn without prejudice the subpoenas it issued to the DRC's UN Mission, Empole, Liolocha, Mfulu, Mpinga, and Ngung. Def. Br. at 23 n.1. Nonetheless, to the extent FG Hemisphere were to seek discovery from the DRC's UN Mission or the DRC's accredited diplomats (*i.e.*, Empole, Liolocha, and Mfulu), several provisions of the VCDR would severely limit if not prohibit that discovery.

The archives and documents of the DRC's UN Mission are protected from discovery. *Cf. Liberian Eastern Timber Corp.*, 659 F. Supp. at 610 n.5 (in light of the VCDR's provisions, it would be "a difficult task at best" to obtain discovery regarding diplomatic accounts). VCDR Article 24 provides that "[t]he archives and documents of the mission are 'inviolable' at any time and wherever they may be." VCDR, art 24. According to a leading diplomatic law expert, "the expression 'inviolable' was deliberately chosen by the International Law Commission to convey

both that the receiving State must abstain from any interference through its own authorities and that it owes a duty of protection of the archives in respect of unauthorized interference by others." Eileen Denza, Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations 192 (3d ed. 2008); *see also 767 Third Ave. Assocs.*, 988 F.2d at 300 (the VCDR "was intended to and did provide for the inviolability of mission premises, archives documents, and official correspondence," and "recognize[s] no exceptions to mission inviolability"). Compelled production of financial and operational records from the DRC's UN Mission would conflict with this provision. Similarly, VCDR Article 27 provides for the inviolability of official correspondence of the mission. Insofar as the discovery sought by FG Hemisphere seeks correspondence concerning diplomatic funds between the DRC's UN Mission and the DRC Government, it could compromise the ability of the Mission to carry out its functions in confidence, thus implicating the United States' obligation to "permit and protect free communication on the part of the mission for all official purposes" and to ensure the inviolability of the Mission's official correspondence. VCDR, art. 27(1)-(2); *see also* Denza, Diplomatic Law at 211 ("Free and secret communication between a diplomatic mission and its sending government is from the point of view of its effective operation probably the most important of all the privileges and immunities accorded under international diplomatic law.").

The VCDR protections also shield the accredited diplomats to the DRC's UN Mission from discovery. VCDR Article 31 provides that diplomatic agents "enjoy immunity from [the receiving state's] civil and administrative jurisdiction" and may not be compelled "to give evidence as [ ] witness[es]." Indeed, under Article 31, "[s]itting diplomats are accorded near-absolute immunity in the receiving state to avoid interference with the diplomat's service for his or her government." *Swarna v. Al-Awadi*, 622 F.3d 123, 137 (2d Cir. 2010). Any attempt by FG Hemisphere to compel

13

deposition testimony from the DRC's diplomats would thus contravene the protections afforded under the VCDR.

Further, to the extent that discovery from Ambassador Gata and local hires Mpinga and Ngung would implicate the inviolability of the Mission's documents and archives by seeking information that these individuals obtained in the exercise of their official duties with the DRC's UN Mission, the DRC may properly assert archival inviolability under Article 24 of the VCDR. The United States regularly asserts this archival inviolability in foreign proceedings with respect to protected information sought from locally engaged staff and U.S. diplomats who have completed their assignment at the U.S. mission, and has a reciprocal interest in affording the same treatment to protect inviolable archives of foreign missions in the United States.

## **CONCLUSION**

For the foregoing reasons, consistent with the United States' treaty obligations and its reciprocity concerns, the Court should modify its Order to prohibit attachment or execution on the DRC's UN Mission bank accounts; prohibit attachment or execution on the bank accounts of the six individuals named in the Order; and prohibit discovery against the DRC's UN Mission, its archives and documents, and its accredited diplomatic personnel.

Dated: New York, New York
December 17, 2021

                                      DAMIAN WILLIAMS
                                      United States Attorney for the
                                      Southern District of New York
                                      *Attorney for the United States of America*

                                          */s/ Christopher Connolly*
By:    CHRISTOPHER CONNOLLY
          Assistant United States Attorney
          86 Chambers Street, 3rd Floor
          New York, New York 10007
          Tel.: (212) 637-2761
          Fax: (212) 637-2786
          E-mail: christopher.connolly@usdoj.gov